**In re Beverly COCHENER, Debtor.**

No. 01–34884.

United States Bankruptcy Court,
S.D. Texas,
Houston Division.

Feb. 9, 2007.

David W. Barry, Law Offices of David W. Barry, Houston, TX, Jason Alexander Hawks, Hawks Law Firm, Tomball, TX, Edmond N. O'Suji, Attorney at Law, Houston, TX, for Debtor.

Hilary B. Bonial, Brice Vander Linden et al., Dallas, TX, John P. Dillman, Linebarger, Goggan, et al., Houston, TX, Diane Brazen Gordon, Butler & Hailey PC, Angela K. Randermann, Houston, TX, for Creditors.

Susan J. Brandt, Nathan Sommers Jacobs, Houston, TX, Mynde Shuane Eisen, Attorney at Law, Houston, TX, for trustee.

**MEMORANDUM OPINION ON: (1) TRUSTEE'S MOTION FOR SANCTIONS AGAINST DAVID BARRY FOR CAUSING UNNECESSARY DELAY AND EXPENSE TO THE ESTATE; (2) DAVID BARRY'S MOTION TO DISMISS THE TRUSTEE'S MOTION FOR SANCTIONS AGAINST DAVID BARRY FOR CAUSING UNNECESSARY DELAY AND EXPENSE TO THE ESTATE; AND (3) REGARDING THE COURT'S SHOW CAUSE ORDER OF SEPTEMBER 1, 2006 AGAINST BEVERLY COCHENER, CHAD COCHENER, AND JASON HAWKS** [Docket Nos. 78, 79, and 95]

JEFF BOHM, Bankruptcy Judge.

## I. INTRODUCTION

In 2005, Congress enacted the Bankruptcy Abuse Prevention and Consumer Protection Act (BAPCPA) to rectify perceived fraud and abuse in the bankruptcy system. The legislative history reflects that Congress passed BAPCPA to address "debtor misconduct and abuse" and "misconduct by attorneys and other professionals" within the bankruptcy system. *See*

H.R.Rep. No. 109–31, at 5 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 92.[1] In the case at bar, which was initiated upon the voluntary filing of a Chapter 7 petition in 2001, the conduct of Beverly Cochener (the Debtor) and one of her attorneys demonstrates why Congress perceived that there was sufficient abuse in the system to warrant passage of this legislation.

The abuse in this case was egregious. The Debtor bears some of the blame; her second attorney bears more. The Debtor's defense is that she relied on the advice of her attorneys; she is correct to a point, but cannot totally evade responsibility for her actions. The attorney, David Barry (Barry), raises certain defenses, not the least of which is that his actions occurred in 2001, and to sanction him now after the passage of this much time is absurd and unfair. It is neither. Indeed, Barry has known since 2001 that the Chapter 7 Trustee was very unhappy with his conduct, and ever since the Trustee's initial expression to Barry of misgivings about his conduct, the Trustee has repeatedly told him that he needed to reimburse the Trustee for the unnecessary legal fees and expenses which the Trustee incurred due to Barry's conduct. Barry chose to turn a

deaf ear to the patient pleas of the Trustee to arrive at a resolution. As a result of Barry's unwillingness to reimburse the Trustee, and because of other events that have occurred since 2001, the Trustee decided to file a Motion for Sanctions against Barry in 2006. Given that, in 2006, the Trustee was finally able to liquidate certain assets, the existence of which Barry did everything in 2001 to prevent the Trustee from uncovering, the Trustee's Motion for Sanctions is hardly absurd or untimely. Just the converse: it is reasonable and timely.[2]

The purpose of this Memorandum Opinion is to discuss the reasons that the Trustee's Motion for Sanctions has merit and what form of sanctions should be imposed against Barry. Additionally, this Opinion addresses what form of sanctions should be imposed against the Debtor, and against her non-debtor son, for their unacceptable conduct.

## II. FINDINGS OF FACT

1. The Debtor initiated the above-referenced case by filing her Chapter 7 petition on May 1, 2001. [Docket No. 1.][3] This case was assigned to

1. Congress was not alone in its concern over misconduct and abuse. The United States Trustee's Civil Enforcement Initiative consistently identified misconduct and abuse by debtors and the debtors' bar. *See* J. Christopher Marshall, *Civil Enforcement Initiative: An Early Report,* J. Nat'l Ass'n Bankr.Tr. 39 (Fall 2002).

2. The Court would also note that this is not a case where evidence has become stale. The letters and pleadings from 2001 are no less telling now than they were then.

3. Unless otherwise indicated, all docket references are to the docket in the above-referenced case, Case No. 01–34884. Further, throughout this Memorandum Opinion, reference to the "Sanctions Hearing" refers to the

multi-day hearing on the following: (A) the Trustee's Motion for Sanctions Against David Barry for Causing Unnecessary Delay and Expense to the Estate (the Motion for Sanctions) [Docket No. 78]; (B) Barry's Motion to Dismiss Trustee's Motion for Sanctions Against David Barry for Causing Unnecessary Delay and Expense to the Estate [Docket No. 79] (Barry's Motion to Dismiss the Trustee's Motion for Sanctions); and (C) this Court's Order (1) Requiring Beverly Cochener, Chad Cochener, and Jason Hawks to Appear in Court at 8:30 a.m. on Wednesday, September 27, 2006 to Give Testimony at the Continuation of the Hearing on the Trustee's Motion for Sanctions Against David Barry for Causing Unnecessary Delay and Expense to the Estate; (2) Requiring Beverly Cochener to Appear in Court at 8:30 a.m. on Wednesday,

the undersigned judge's predecessor, the Honorable William R. Greendyke (Judge Greendyke).

2. The Debtor's attorney on May 1, 2001 was Jason Hawks (Hawks). [Docket No. 1.]

3. Along with her petition, the Debtor filed her Schedules. [Docket No. 1.]

4. The Debtor's Schedules set forth that her total assets were $403.00, and her liabilities were $111,000.00. [Docket No. 1, Summary of Schedules.]

5. The Debtor listed her personal property, which included $18.00 in cash on hand, clothing, a small collection of books, jewelry valued at $35.00, and other items, all totaling $403.00. [Docket No. 1, Schedule B.] The Debtor claimed all of this property as exempt property. [Docket No. 1, Schedule C.]

6. Notably, the Debtor did not include any real property in her Schedules, thereby representing to this Court that she owned none. [Docket No. 1, Schedule A.]

7. The Debtor did not schedule any secured creditors. [Docket No. 1, Schedule D.]

8. The Debtor did, however, schedule ten (10) unsecured creditors, indicating $111,000.00 in total unsecured debts. [Docket No. 1, Schedule F.] One of these creditors was her ex-husband, John Cochener[4]; the other unsecured creditors were five credit card companies and banks, a psychologist, and three other individuals. *Id.* The Debtor did not schedule any of these debts as disputed. [Docket No. 131, p. 78:2–15.]

9. The Debtor further indicated in her Schedule I that she had no current monthly income, with the following footnote:

Although debtor did receive some monthly maintenance payments from her ex-husband during the divorce (year 2000 was when payments were received), debtor has not been employed either prior to or subsequent to her divorce. Debtor currently lives expense free with her son, who has been supporting her in his home since just prior to the date of divorce.

[Docket No. 1, Schedule I.]

10. The Debtor's Schedule J indicated "$0.00" for her monthly expenses

September 27, 2006 to Show Cause Why She Should Not be Sanctioned for Abuse of the Bankruptcy Process and/or Defrauding the Court; and (3) Requiring Beverly Cochener and Chad Cochener to Appear in Court at 8:30 a.m. on Wednesday, September 27, 2006 to Show Cause Why One or Both of Them Should Not be Sanctioned for Destruction of Property of the Bankruptcy Estate [Docket No. 95] (the Show Cause Order).

On August 31, 2006, this Court commenced the Sanctions Hearing on the Trustee's Motion for Sanctions [Docket No. 78] and Barry's Motion to Dismiss the Trustee's Motion for Sanctions [Docket No. 79]. On September 1, 2006, this Court signed the Show Cause Order. [Docket No. 95.] On September 27, 2006, this Court reconvened the Sanctions Hearing on the Trustee's Motion for Sanc-

tions and Barry's Motion to Dismiss the Trustee's Motion for Sanctions, at which time the Court also heard evidence responsive to the Show Cause Order. The Sanctions Hearing was continued on September 28, 2006 and then continued on October 20, 2006. On October 25, 2006, this Court orally announced its findings of fact and conclusions of law from the bench regarding the Trustee's Motion for Sanctions, Barry's Motion to Dismiss the Trustee's Motion for Sanctions, and the Show Cause Order. References to Docket Nos. 130, 131, 132, and 135 refer to transcripts of the several days comprising the Sanctions Hearing.

4. The Final Decree in the divorce of the Debtor and John Cochener was entered on November 3, 2000. [Docket No. 10, Exhibit A.]

with the following notation: "Debtor lives expense free in her son's home." [Docket No. 1, Schedule J.]

11. The Debtor's son, with whom she has lived, is Chad Cochener. [Docket No. 131, p. 95:20–21.] At or about the time that the Debtor filed her Chapter 7 petition, Chad Cochener was a consultant at a car wash in Houston, Harris County, Texas. [Docket No. 132, p. 15:1–16.]

12. On May 15, 2001, the Clerk of the Bankruptcy Court sent all interested parties the Notice of Commencement of Case Under Chapter 7 of the Bankruptcy Code, Meeting of Creditors, and Fixing of Dates, which stated in pertinent part:

MEETING OF CREDITORS. The debtor (both husband and wife in a joint case) *is required to appear at the meeting of creditors* on the date and at the place set forth above for the purpose of being examined under oath ... The meeting *may be continued* or adjourned from time to time by notice at the meeting ...

[Docket No. 4 (emphasis added).]

13. On May 17, 2001, the Debtor filed an Amended Summary of Schedules, listing total assets of $403.00 and amending the amount of her total liabilities to $111,556.99. [Docket No. 5, Amended Summary of Schedules.]

14. On May 17, 2001, the Debtor also filed an Amended Schedule F, changing the amount of the claim for creditor Dana Carlson from $7,775.90 to $9,707.89. [Docket No. 5, Amended Schedule F.] The Debtor also changed John Cochener's claims, keeping the first in the amount of $35,661.11, and reducing the second to $10,000.00 while adding the designation "Attorney's Fees." *Id.* Additionally, the Debtor added a third claim for John Cochener in the amount of $1,000.00 with the designation "Attorney's Fees." *Id.*

15. The Debtor's Statement of Financial Affairs and Schedules, as initially filed and as amended, were inaccurate.

16. The initial Meeting of Creditors was held on June 6, 2001. [Docket No. 4.] In attendance were: (a) Ron Sommers, the Chapter 7 Trustee in this case (the Trustee); (b) the Debtor; (c) Hawks, as counsel for the Debtor; and (d) Pam Stewart (Stewart), the attorney for John Cochener. [Docket No. 131, pp. 75:25–76:5, 81:11–13.]

17. The fact that the Debtor scheduled $403.00 in assets, combined with information that the Trustee received from John Cochener, gave the Trustee concerns that the Debtor's Schedules were inaccurate. [Docket Nos. 130, pp. 33:18–34:1; 131, pp. 131:15–133:22.] The Trustee had developed these concerns as of June 6, 2001. [Docket No. 131, p. 133:6–17.]

18. At the Meeting of Creditors on June 6, 2001, the Trustee therefore requested certain documentation from the Debtor, including: the Debtor's Divorce Decree; any trust agreements between the Debtor, Chad Cochener, or anybody related to him; and information regarding the ownership of the property where the Debtor was residing. [Docket No. 130, pp. 34:2–35:12; Docket No. 131, p. 76:19–77:1.]

19. The Trustee made this request in fulfilling his duties as the Chapter

7 Trustee to investigate the assets in the Debtor's case and the financial condition of the Debtor. [Docket No. 130, p. 35:7–12.]

20. On behalf of the Debtor, and in the Debtor's presence, Hawks agreed to produce the documents that the Trustee requested within 10 days. [Docket No. 130, p. 34:22–25; Docket No. 131, pp. 54:10–55:16, 81:11–21, 89:1–15, 126:2–17.] Moreover, the Debtor agreed to produce the documents. [Docket No. 131, p. 126:2–14.] The Trustee therefore continued the Meeting of Creditors for 14 days until June 20, 2001 so that he could first review the documents to be produced and then examine the Debtor about these documents, including any transactions related to or described in the documents. [Docket No. 131, p. 126:2–17; Docket No. 130, p. 35:1–6.]

21. At the end of the June 6, 2001 Meeting of Creditors, the Trustee expressly informed the Debtor that she must attend the continuation of the Meeting of Creditors to be held on June 20, 2001. [Docket No. 131, pp. 125:25–126:19; Trustee's Exhibit No. 1.][5]

22. Both the Debtor and Hawks agreed to appear at the continued Meeting of Creditors. [Docket No. 131, p. 126:18–19.]

23. At the initial Meeting of Creditors held on June 6, 2001, given the questions being asked by the Trustee and the documents which the Trustee requested, Hawks began to feel that he was "in over [his] head" in representing the Debtor in her Chapter 7 case. [Docket No. 131, pp. 55:17–23; 81:22–82:17.] Hawks, who is not a board certified bankruptcy attorney [Docket No. 131, p. 55:24–25], concluded that the Debtor's Chapter 7 case required a more experienced attorney. Hawks therefore "talked to several people" [Docket No. 131, p. 82:3], including Barry, who testified that he has been licensed since 1986 and board certified in consumer bankruptcy law since 1991. [Docket No 135, pp. 5:3–4, 6:8–15; Docket No. 131, pp. 55:19–56:4 and 17–20.]

24. Hawks told Barry that the Debtor's ex-husband had sent an attorney to the June 6, 2001 initial Meeting of Creditors, and that it appeared to Hawks that an adversary proceeding was going to be filed against the Debtor. [Docket No. 131, p. 82:11–17.] Hawks also communicated to Barry that he (i.e. Hawks) had concerns about the Debtor concealing assets given the issues raised by the Trustee at the initial Meeting of Creditors on June 6, 2001. [Docket No. 131, pp. 82:18–83:8.] Hawks also made Barry aware that the Trustee had requested documents and had adjourned the Meeting of Creditors until June 20, 2001. [Docket No. 131, p. 55:6–12.] Hawks further informed Barry in a letter dated June 11, 2001 that the attorney for the Debtor's ex-husband told Hawks that the Debtor had conveyed various assets to her son prior to the filing of her bankruptcy. [Docket No. 131, pp. 23:19–24:10.]

---

5. Citations to Trustee's Exhibit No. refer to the exhibits admitted by the Trustee during the Sanctions Hearing.

Specifically, Hawks' letter contained the following statement regarding what the ex-husband's attorney told Hawks: "And, although assets were transferred to her son Chad outside one year of filing, the intent for those transfers was to simply hide or shelter those assets from being used to satisfy creditors once the bankruptcy came and Chad is simply using the money to support Ms. Cochener, his mother, which is no different than if Ms. Cochener had kept the money for herself." [Docket No. 131, p. 24:1–10.] Hawks informed Barry that he (i.e. Hawks) did not understand what to do next, and inquired whether Barry could take on the representation. [Docket No. 131, p. 56:1–4 and 15–20.]

25. In addition to communications between solely Hawks and Barry, Hawks and the Debtor had a face-to-face meeting with Barry at some point after the initial Meeting of Creditors held on June 6, 2001, but prior to June 18, 2001. [Docket No. 135, p. 8:14–20; Docket No. 131, p. 83:12–17.] This meeting was held at Barry's office. [Docket No. 135, p. 8:10–13.]

26. At some point between the June 6, 2001 Meeting of Creditors and June 18, 2001, Barry began representing the Debtor. [Docket No. 131, p. 84:6–14; Docket No. 135, p. 8:17–20.] The exact date appears to be no later than June 15, 2001 because it was on that day that Barry telefaxed to Hawks a copy of a Motion to Dismiss the Debtor's Chapter 7 Case (the Motion to Dismiss) that Barry had drafted and sent to Hawks with a message that read as follows: "Following is the motion to dismiss I will file and serve Monday, June 18th, 2001." [6] [Docket No. 131, pp. 90:18–91:10.] Although Hawks was still formally attorney of record for the Debtor, Barry was unquestionably the attorney-in-charge. Indeed, Hawks, when asked at the Sanctions Hearing whether he was still attorney of record on June 18, 2001, responded that "I thought I had passed the football, but I guess I was technically still attorney of record." [Docket No. 131, p. 84:15–19.] When asked whether he (i.e. Hawks) was "okay with [Barry] taking the lead to do things because he thought he was taking over the case," Hawks responded unequivocally that "Yes, that's what I wanted to have happen." [Docket No. 131, pp. 84:25–85:2.] And, this Court finds that this is exactly what happened. Almost immediately after Barry had his face-to-face meeting with Hawks and the Debtor, Barry drafted and filed the Motion to Dismiss which identified himself as "Associate Counsel for Debtor." [Docket No. 7; Docket No. 135, pp. 10:25–11:3; Docket No. 131, pp. 84:11–85:15.] While Hawks' name was also on the Motion to Dismiss, Barry signed Hawks' name, and Barry was unquestionably the attorney in charge. Indeed, Hawks testified that after the face-to-face meeting with Barry and the Debtor, he (i.e. Hawks) performed no additional

---

**6.** There is no question that Barry, not Hawks, drafted the Motion to Dismiss; both Hawks and Barry testified to this effect. [Docket No. 131, p. 84:11–14; *see also* Docket Nos. 7, 135, pp. 11:19–13:8.]

services for the Debtor. [Docket No. 131, p. 90:3–12.] Moreover, the Trustee also understood that Barry had taken over the representation as of the filing of the Motion to Dismiss. [Docket No. 131, p. 128:12–21.] Thus, although it was not until July 24, 2001 that Barry, on behalf of the Debtor, filed a Motion to Substitute Attorney of Record, seeking to substitute himself for Hawks as the attorney of record [Docket No. 12], the Court finds that Barry took over representation of the Debtor no later than June 18, 2001.[7]

27. Prior to June 18, 2001, Barry spoke with Stewart, the attorney for the Debtors' ex-husband, and she informed him that she would oppose any motion to dismiss this Chapter 7 case that Barry would file on behalf of the Debtor. [Docket No. 135, pp. 11:19–12:9.]

28. On June 18, 2001, Barry, now acting in his capacity as the attorney for the Debtor, filed the Motion to Dismiss this Chapter 7 case. [Docket No. 7.] In the Motion to Dismiss, Barry made the following allegations: (1) "No creditor in this case would suffer any legal prejudice by its dismissal;" and (2) "The interests of the creditors and Debtor would be better served by the dismissal of this bankruptcy proceeding rather than its continuation and adjudication." *Id.* Barry offered no further reason for why the case should be dismissed.

29. Prior to filing the Motion to Dismiss, Barry knew about the Trustee's concern that the Debtor had concealed assets certain transfers of property. [Docket Nos. 135, p. 29:8–13; 131, pp. 82:18–83:8.]

30. In a letter to the Trustee dated June 18, 2001, Barry indicated that there was a copy of the Debtor's Motion to Dismiss enclosed with the letter, that the Motion to Dismiss would be filed the same day, that Barry understood that the Meeting of Creditors had been "adjourned until June 20, 2001," and that "[t]he Debtor will not attend that meeting." [Trustee's Exhibit No. 2.] The Court finds that Barry instructed the Debtor not to attend this continued Meeting of Creditors. The Court further finds that the Debtor, unaware of the intricacies of bankruptcy law, relied upon Barry's advice in not attending this continued Meeting of Creditors. [Docket No. 131, p. 120: 12–16.][8]

7. The Court makes this finding despite Barry's testimony at the Sanctions Hearing that he filed the Motion to Dismiss "before I actually took over the representation." [Docket No. 135, p. 11:3–4.] For Barry to state that he filed the Motion to Dismiss before actually taking over the representation is nothing short of disingenuous, particularly given the very credible testimony of Hawks, who stated that by June 18, 2001, he had "passed the football" to Barry. As further discussed in this Memorandum Opinion, Barry filed the Motion to Dismiss in order to justify—wrongly—to the Trustee why the Debtor and he would not attend the continued Meeting of Creditors and why the Debtor would not pro-

duce the documents which Hawks and she had promised would be produced when the Trustee made the request on June 6, 2001.

8. While this Court does not find the Debtor's testimony to be overly credible on certain issues, the Court does find her testimony credible in one respect: she testified that she relied upon the advice of her counsel [Docket No. 131, pp. 120:12–121:5], and this Court finds that on this point, she is credible. The Debtor attended the initial Meeting of Creditors with Hawks, and Hawks testified that if he had continued to represent her, he and she would have attended the continued Meeting of Creditors. [Docket No. 131, p. 89:1–9.]

31. On June 18, 2001, the Trustee telephoned Barry to inform him that the Debtor's attendance and Barry's attendance at the continued Meeting of Creditors was not optional and that they needed to be present. [Docket No. 130, pp. 38:5–39:8; Docket No. 131, pp. 127:23–128:2, 143:12–25.]

32. On June 19, 2001, the Trustee filed a Response and Objection to the Debtor's Motion to Dismiss. [Docket No. 8.]

33. On June 20, 2001, John Cochener, through his counsel, Stewart, filed a Notice of Appearance and Request for Service of Papers [Docket No. 9], together with his Response and Objection to Debtor's Motion to Dismiss. [Docket No. 10.]

34. Neither the Debtor nor Barry attended the June 20, 2001 continuation of the Meeting of Creditors, although both were aware of the continued meeting and could have attended. [Docket Nos. 135, p. 15:14–16; 131, p. 120:12–16; Trustee's Exhibit Nos. 1, 2.] [9]

35. Because the Debtor did not attend the June 20, 2001 continued Meeting of Creditors, the Trustee was unable to carry out his duties to examine the Debtor about her financial condition, including any conveyances that she made prior to the filing of her bankruptcy petition.

36. The Trustee again continued the Meeting of Creditors until August 29, 2001 at 9:30 a.m. [Docket No. 17; Trustee's Exhibit No. 3.]

37. A letter dated August 13, 2001 from the Trustee's office informed Barry of this additional continuance. [Trustee's Exhibit No. 3.]

38. In a letter dated August 14, 2001, Barry informed the Trustee that neither he nor the Debtor would attend the August 29, 2001 continuation of the Meeting of Creditors. [Trustee's Exhibit No. 4.] Specifically, Barry's letter contained the following three paragraphs:

We have received your correspondence in which you indicate you have set the continued § 341 meeting in this case for August 29, 2001, at 9:30 a.m.

Neither my client nor I shall appear that day. As you know there is a hearing scheduled on September 4,

By June 18, 2001, Barry had taken over the representation, and this Court finds that the reason the Debtor failed to attend the rescheduled Meeting of Creditors was due to advice that Barry gave to her: namely, do not attend because the Motion to Dismiss has been filed; and, if Judge Greendyke grants this Motion, there can be no continued Meeting of Creditors. [*See* Finding of Fact No. 38 concerning a letter written by Barry articulating the argument that there should be no continuation of the Meeting of Creditors until Judge Greendyke ruled on the Motion to Dismiss.] Given the record, this Court can reach no other conclusion than that Barry advised the Debtor not to attend the continued Meeting of Creditors. The testimony from the Debtor was that she relied upon the advice of her counsel, and there is no testimony to the contrary; nor is there testimony from Barry denying that he told the Debtor not to attend the continued Meeting of Creditors. Indeed, even if Barry had so testified, this Court would be skeptical since this particular Debtor clearly had no understanding of the Bankruptcy Code or her duties to appear at all meetings of creditors—thereby compelling the conclusion that she was telling the truth when testifying that she relied on her attorney's advice.

9. There is no question that the scope of Barry's representation included his attendance at the continued Meeting of Creditors. [*See* Finding of Fact No. 45.]

2001, at which time Judge Greendyke shall hear the pending Motion to Dismiss.

In the unlikely event the case is not dismissed on September 4, 2001, if you wish to re-convene the § 341 meeting after that date, I will be glad to prepare, serve, and file the appropriate notice.

*Id.*

39. Neither Barry nor the Debtor appeared at the August 29, 2001 continuation of the Meeting of Creditors. Once again, the Debtor did not attend this continued Meeting of Creditors based upon Barry's advice. [Docket No. 131, p. 120:17–24.]

40. Additionally, neither Barry nor the Debtor had produced any of the documents that Hawks, on behalf of the Debtor and in the Debtor's presence at the initial Meeting of Creditors on June 6, 2001, had represented to the Trustee that the Debtor would produce. The Court

finds that Barry instructed the Debtor not to produce these documents, and the Court further finds that the Debtor, unaware of the intricacies of bankruptcy law, relied upon Barry's advice in not producing the documents.[10] [Docket No. 131, pp. 113:18–23, 117:22–118:1.]

41. The Trustee's attorney, Mynde S. Eisen (Eisen), wrote Barry a letter dated September 7, 2001, stating as follows:

Pursuant to my conversations with Ira Joffe[11] at the hearing on [Debtor's] Motion to Dismiss and Judge Greendyke's edict that discovery should commence, I need to schedule the 2004 examination of the Debtor.... I would like to schedule this examination on one of the following dates:

. . .

I will be sending you a list of documents that need to be produced prior to the depositions so that I may review them.

10. *See* Footnote No. 8. Just as this Court finds that the Debtor relied upon Barry's advice not to attend the rescheduled Meeting of Creditors, this Court finds that the Debtor relied upon Barry's advice not to produce to the Trustee those documents that Hawks and the Debtor had promised to produce at the close at the initial Meeting of Creditors held on June 6, 2001. The Court finds that Barry advised the Debtor not to turn over the documents from three sources in the record. First, it is well established that the Debtor was present when Hawks made the promise on June 6, 2001, and there is no evidence to believe that the Debtor did not intend to comply. [Docket No. 131 pp. 125:25–126:19; pp. 89:10–90:1.] Second, the Debtor testified that she had completely relied on the advice of her counsel. Third, Barry's letter to the Trustee of August 14, 2001 made it clear that in his view, the Trustee could not further examine his client unless two conditions were met: (1) a hearing was held on the Motion to Dismiss; and (2) Judge Greendyke denied the

Motion. [Trustee's Exhibit No. 4.] The only logical finding to make from this record is that once Barry was involved in representing the Debtor, Barry instructed the Debtor that she did not have to turn over any documents until there was a ruling on the Motion to Dismiss. In light of this finding, Barry's argument that he could not have complied with the request to turn over documents because the Debtor never gave the documents to him is disingenuous. [Docket No. 120, ¶ 127.] Barry may not assert this defense when he is the one responsible for the Debtor not producing the documents. If the facts were otherwise, Barry would have appeared at the continued Meeting of Creditors on June 20, 2001 and informed the Trustee that the Debtor had decided herself not to produce the documents.

11. Mr. Joffe is an attorney who worked at Barry's law firm. Mr. Joffe also represented Barry at the Sanctions Hearing.

. . .

I have not spoken to [the Trustee], but I assume he will also be rescheduling the creditors' meeting. Either he or I will let you know the date of the rescheduled creditors' meeting.

[Trustee's Exhibit No. 5.]

42. In a letter to Barry dated September 20, 2001, Eisen wrote that she had received no response indicating Barry's or the Debtor's preference for a date to conduct the 2004 examination. [Trustee's Exhibit No. 6.] Eisen set forth additional dates that she was available to conduct the 2004 examination, reiterated that she would be including a document request with the notice of the 2004 examination, and indicated, "If I have not heard from you by 4:00 p.m. on Friday, September 21, 2001, I will choose one of the dates above and notice the 2004 examination accordingly." *Id.*

43. Eisen received no response from Barry. Accordingly, on October 17, 2001, Eisen filed the Notice of 2004 Examination of Beverly Cochener, which included a document production request. [Docket No. 24.]

44. In a letter dated October 17, 2001, Barry indicated the following: (1) he had received the Notice of 2004 Examination of Beverly Cochener [Docket No. 24]; (2) the Trustee's document requests "overreach[ed] the Trustee's power"; (3) "[t]he Bankruptcy Code permits the Trustee to look back for up to one year with an eye toward fraudulent transfers or preferences to insiders;"[12] (4) the Debtor was divorced in November of 2000, and "the divorce decree [would] show transfers of property owned by the Debtor and her former spouse on the date of its entry. It would seem that only transfers made later are relevant here;" and (5) if Eisen would amend her subpoena, Barry would not have to "seek to quash the requests." [Trustee's Exhibit No. 8.] Barry made these statements well after Hawks had informed him in the June 11, 2001 letter that there was a suspicion that the Debtor had transferred assets to her son more than one year prior to the filing of the Debtor's bankruptcy petition. [*See* Finding of Fact No. 24.]

---

12. As of October 17, 2001, the date of this letter, the Bankruptcy Code provided that the Trustee may avoid fraudulent transfers that occurred within one year prior to the filing of bankruptcy. 11 U.S.C. § 548(a)(1), (b) (2001). (Pursuant to the amendments to the Bankruptcy Code through BAPCPA, effective October 17, 2005, this one-year period has been expanded to two years. 11 U.S.C. § 548(a)(1), (b) (2006).) Additionally, § 544(b) provides, both before and after BAPCPA, that "the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable [state] law." 11 U.S.C. § 544(b) (2001), (2006); *Gandy v. Gandy (In re Gandy)*, 299 F.3d 489, 496 (5th Cir.2002); *Topcor, Inc. v. Cont'l Ill.Nat'l Bank & Trust Co. of Chicago (In re Topcor, Inc.)*, 54 Fed.Appx. 405, n. 5 (5th Cir.2002) (unpublished opinion). Pursuant to Texas state law, a four-year statute of limitations applies to fraudulent transfer actions. Tex Bus. & Comm. Code Ann. § 24.005 (1999), (2002); Tex. Civ. Prac. & Rem. Code Ann. § 16.004 (1999), (2002); *Gandy*, 299 F.3d at 496–97, n. 7. Accordingly, 11 U.S.C. § 544(b) allows the Trustee to look back at transactions that occurred for the four year period prior to the filing of the bankruptcy petition. Thus, Barry's statement in his letter that the Bankruptcy Code only permits the Trustee to look back for up to one year was dead wrong.

45. On October 17, 2001, Barry filed a Disclosure of Compensation Under 11 U.S.C. § 329 and B.R. 2016(B) setting forth that the Debtor had paid him $2,500.00 for his representation in her Chapter 7 case and stating, in pertinent part, as follows:

I further certify that the Debtor has been informed and has agreed that the compensation paid shall include the following legal services: (a) All conferences with the Debtor; (b) Preparation of Petition and Schedules; (c) *Attendance at 341 First Meeting* and attendance at reaffirmation and/or confirmation hearings; (d) Preparation of routine motions.

[Docket No. 25 (emphasis added).] Barry signed the Disclosure of Compensation and dated it October 15, 2001.

46. Eisen responded to Barry's letter of October 17, 2001 by sending Barry a letter on October 22, 2001. [Trustee's Exhibit No. 9.] In her letter, Eisen wrote the following:

I disagree with your interpretation of the document production request. *[The Trustee] can inquire about transactions for the past four years as he can avail himself of the fraudulent transfer statute under Texas law, as well as the one year statute provided by the Bankruptcy Code.* I am not only concerned about transfers that the Debtor made to her ex-husband, but also transfers she may have made to any insider, including her children. Her divorce in 2000 does not necessarily shield her transfers made prior to her divorce during the four year period. The Debtor's refusal to produce documents during this four year time period makes me even more suspect that she is hiding assets.

*Id.* (emphasis added).

47. The 2004 Examination of the Debtor was reset twice and finally set for November 14, 2001. [Trustee's Exhibit Nos. 10, 11.]

48. The Debtor did not produce any documents responsive to the Trustee's document request in the 2004 Examination Notice nor did the Debtor appear at the 2004 Examination. [Trustee's Exhibit No. 12.]

49. However, Barry did appear at the 2004 Examination on November 14, 2001, where he stated that the Debtor was not present at the 2004 Examination, that he did not expect her to appear, and that he had not heard from the Debtor for a few weeks. *Id.*

50. On November 20, 2001, the Trustee filed his Expedited Motion to Dismiss Debtor's Motion to Dismiss Chapter 7 Proceeding or Alternatively Motion for Continuance. [Docket No. 26.]

51. On November 29, 2001, Barry filed his Motion to Withdraw as Attorney of Record. [Adversary No. 01–3306, Docket No. 10.]

52. On December 17, 2001, the Trustee filed his Objection to Barry's Motion to Withdraw as Attorney of Record. [Docket No. 34.] In his Objection, the Trustee stated, among other things, the following:

9. At the first meeting of creditors, it became apparent that Debtor may have concealed, hidden or failed to disclose transfer of assets to her son and other insiders. Barry's continued refusal to produce the documents and have Debtor appear at the first meeting of the creditor [sic] has caused the bankruptcy to incur costs and expenses. It is apparent that he had advised her not to appear or produce such documents which has now caused

Debtor not to comply with the 2004 examination request.

10. The bankruptcy estate has incurred costs and expenses in its attempts to administrate the estate. The administration of the estate has been hindered by Barry and his refusal to produce the Debtor at the reset of the creditors [sic] meetings. Barry should not be allowed to withdraw as counsel without paying the Trustee's attorneys' fees and costs incurred to date.

11. Trustee requests that this Court deny Barry's motion to withdraw, or alternatively, if the Court allows the withdrawal, require Barry to pay the Trustee's fees and costs incurred to date because of his refusal to produce the Debtor and documents at the reset creditors [sic] meetings.

*Id.*

53. Judge Greendyke gave consideration to Barry's Motion to Withdraw and to the Trustee's response in opposition thereto.[13]

54. On January 21, 2002, Judge Greendyke signed the Order Allowing Barry to Withdraw as Attorney of Record in both the above-referenced main case and in Adversary No. 01–3306, *John Cochener v. Beverly Cochener.* [Docket No. 37.] This Order was entered in the above-referenced main case on January 23, 2002 and in Adversary

Proceeding No. 01–3306 on January 22, 2002. [*Id.;* Adversary No. 01–3306, Docket No. 12.] The Order Allowing Barry to Withdraw as Attorney of Record did not provide for fees and costs to be awarded to the Trustee, even though the Trustee requested fees and costs incurred due to Barry's "refusal to produce the Debtor and documents at the reset creditors [sic] meetings." [Docket No. 34.] However, Judge Greendyke, in his own handwriting, added the following to the Order: "This order is without prejudice to any claims, ethical or otherwise, held by the Ch. 7 trustee." [Docket No. 37; Adversary No. 01–3306, Docket No. 12.] This Court finds that Judge Greendyke expressly left open the door for the Trustee to pursue any claims, including sanctions, that he believed he had against Barry.

55. Ever since the Trustee retained Eisen as his counsel—which was in August of 2001 [Docket No. 130, pp. 72:23–73:1]—Eisen has, from time to time, spoken with Barry to remind him that the Trustee was unhappy with Barry's tactics in 2001 and informed him that he needed to call the Trustee and attempt to negotiate a settlement whereby Barry would pay the Trustee the fees and expenses that

---

**13.** In response to a question at the Sanctions Hearing as to what happened at the hearing on Barry's Motion to Withdraw, Eisen stated as follows: "It was a very short hearing. Basically, Judge Greendyke allowed him to withdraw but basically gave the impression when I asked him about the attorney's fees and costs basically saying that was the subject of another motion or should be another motion." [Docket No. 130, pp. 89:22–90:1.] Additionally, Barry testified that, about the time that Judge Greendyke allowed Barry to with-

draw, "the Trustee did bring up sanctions or wanting to be reimbursed for costs. [Judge Greendyke] essentially told them they would need to do that under a proper motion." [Docket No. 135, p. 42:13–16.] Indeed, Judge Greendyke preserved the Trustee's right to seek sanctions against Barry by penning in the following language when signing the order granting Barry's Motion to Withdraw: "This order is without prejudice to any claims, ethical or otherwise, held by the Ch. 7 trustee." [Docket No. 37.]

the Trustee incurred in defeating the Motion to Dismiss.[14] [Docket No. 130, pp. 90:15–91:14.] Although Barry was aware of the Trustee's belief that Barry should reimburse him for the costs associated with defeating the Motion to Dismiss [Docket No. 135, p. 42:4–18], Barry never availed himself of the opportunity to confer with the Trustee about this issue. Accordingly, on June 19, 2006, the Trustee filed the pending Motion for Sanctions. [Docket No. 78.]

56. The Trustee testified that he takes motions for sanctions very seriously and that the Motion for Sanctions against Barry was only the second that he had filed in over 30 years of practice. [Docket No. 130, p. 46:10–13.] The Trustee held off filing the Motion for Sanctions primarily for two reasons. First, the Trustee views filing a motion for sanctions as a very serious matter, and he wanted to give Barry every opportunity to resolve the matter amicably without resorting to a court hearing. [Docket No. 130, p. 46:8–15.] Second, the Trustee held off filing the Motion for Sanctions because he wanted to see what assets the estate could recover, and then, once having considered this fact, make a determination as to the extent that Barry had hampered his ability to administer the case. [Docket No. 130, pp. 46:5–47:18.] The Trustee could not make this determination until he had gathered together sufficient documentation about the Debtor's real estate transactions, filed suit to unwind these conveyances, and then attempted to sell the property that was retrieved. The gathering together and analysis of the documents evidencing the Debtor's conveyances of real estate, the filing by the Trustee of an adversary proceeding against the Debtor and her son, the prosecution of the adversary proceeding, the obtaining of a judgment, the defense of the judgment on appeal, the recovery of this real estate, the eventual selling of one of the properties, and the abandonment of the other, took almost five years. After assessing this situation, the Trustee decided he needed to seek sanctions on the grounds that Barry "took a position ... that obstructed justice and impacted my ability to administer this case." [Docket No. 130, p. 47:16–18.]

57. After the hearing on the Debtor's Motion to Dismiss had been reset, continued, and then duly noticed by the Court to continue on May 6, 2002, the Debtor failed to appear. [Docket Nos. 11, 15, 21, 22, 23, 28, 29, 31, 32, 36, 42.]

58. Accordingly, Judge Greendyke signed the Order Denying Debtor's Motion to Dismiss on May 6, 2002. [Docket No. 41.]

59. The Debtor did not appeal the Order Denying Debtor's Motion to Dismiss.

60. The Debtor's initial and amended Schedules and Statement of Financial Affairs have always been inaccurate, and the Debtor has never filed accurate Schedules and a Statement of Financial Affairs.

14. As subsequently discussed herein, the Trustee successfully defeated the Motion to Dismiss. [*See* Finding of Fact No. 58.]

61. After a significant expenditure of resources, the Trustee eventually obtained documents that led him to discover the Debtor's assets in this case. [Docket No 130, pp. 44:17–45:24.] These documents assisted him in discovering assets that the Debtor had transferred and excluded from her Schedules. Among these assets were two pieces of real estate, $50,000.00 in cash, Persian rugs worth approximately $10,000.00, a crystal chandelier worth approximately $10,000.00, a mahogany door worth approximately $2,000.00, business assets worth approximately $12,000.00, sterling silver worth approximately $5,000.00, investment funds totaling approximately $91,407.00, in addition to other investment funds of an unknown amount, and other personal property. [Adversary Proceeding No. 02–3261, Docket No. 1.] After discovering the assets that the Debtor transferred prior to her bankruptcy, the Trustee commenced Adversary Proceeding No. 02–3261 on May 3, 2002 by filing the Trustee's Complaint to Set Aside Fraudulent Transfers Under 11 U.S.C. § 544 and to Recover Avoided Transfers Under 11 U.S.C. §§ 549, 550 (the Adversary Proceeding). *Id.*

62. The Trustee brought the Adversary Proceeding against the Debtor and her son, Chad Cochener, individually and as trustee of the Sara Cochener Investment Trust and the Hunter Investment Trust, the Sara Cochener Investment Trust, the Hunter Cochener Trust, Sara Cochener, by and Through her Next Friend of Chad Cochener, Hunter Cochener, by and Through his Next of Friend, Chad Cochener

(collectively, the Defendants). *Id.* Hunter Cochener is Chad Cochener's son, and Sara Cochener is the Debtor's daughter. [Docket No. 131, p. 186:4–8, 23–25.]

63. The Trustee alleged that the Debtor accepted a check payable to her and her ex-husband, John Cochener, for the proceeds from the sale of their community property upon their divorce, for which the Final Decree was entered on November 3, 2000. [Docket No. 10, Exhibit A.] The Trustee further alleged that the Debtor deposited the entire amount of the check into a bank account without the consent of John Cochener. [Adversary No. 02–3261, Docket No. 1, ¶ 12.] The Trustee also alleged that the Debtor transferred most, if not all, of these funds to accounts held by Chad Cochener, either for himself or for Hunter Cochener or Sara Cochener. [*Id.* at ¶ 13.] The Trustee alleged that these funds were used to purchase real properties located at: (1) 18314 Westlock Street, Tomball, Harris County, Texas (the Westlock Property); and (2) 18326 Campbellford, Tomball, Harris County, Texas (the Campellford Property) (collectively, the Real Properties). [*Id.* at ¶¶ 14–15.] The Trustee further alleged that the Debtor transferred $50,000.00 to the Hunter Trust and then used the money for her personal use. [*Id.* at ¶ 16.] Additionally, the Trustee alleged that the Debtor transferred the following personal property to Chad Cochener: (1) two Persian rugs (approximate value $10,000.00); (2) a crystal chandelier (approximate value $10,000.00); (3) a mahogany door

(approximate value $2,000.00); (4) assets of the Alpha Omega Business (approximate value $12,000.00); (5) sterling silver (approximate value $5,000.00); and (6) other personal property. [*Id.* at ¶¶ 17–18.] The Trustee also alleged that the Debtor transferred to the Defendants investment funds totaling approximately $91,407.00 and additional investment funds of an unknown amount. [*Id.* at ¶ 19.]

64. The Trustee alleged that these transfers constituted fraudulent transfers and sought turnover of the property. [*Id.* at ¶¶ 20–29.]

65. The Debtor and the other Defendants did not file an answer in the Adversary Proceeding.

66. The Trustee filed a Motion for Default Judgment in the Adversary Proceeding on December 20, 2002. [Adversary No. 02–3261, Docket No. 8.]

67. The Debtor and the other Defendants did not file a response to the Trustee's Motion for Default Judgment in the Adversary Proceeding.

68. On February 11, 2003, in the Adversary Proceeding, Judge Greendyke signed a Judgment against the Debtor and the other Defendants. [Adversary No. 02–3261, Docket No. 9.] In the Judgment, Judge Greendyke found that the Defendants failed to appear or answer, despite being duly and legally cited. *Id.* Judge Greendyke further found that the Debtor's transfers of the Real Properties, the personal property, and the monies to the other Defendants constituted fraudulent transfers and that such property was property of the bankruptcy estate. *Id.* Judge Greendyke therefore ordered that: (1) the Trustee take possession of the Real Properties; (2) the Trustee was entitled to sell the Real Properties; (3) the Trustee recover against the Defendants "jointly and severally for $20,440.00 as the value of the personal property fraudulently transferred with interest thereon at the rate of ten (10%) per annum from the date of judgment until paid;" (4) the Trustee recover from the Defendants "jointly and severally, the sum of $91,406.00 with interest thereon at ten percent (10%) per annum from the date of judgment until paid;" and (5) the Trustee be granted judgment against the Defendants "jointly and severally for all costs of court." *Id.*

69. At the time that the Real Properties became part of the bankruptcy estate, the Debtor and Chad Cochener were residing on them.

70. On February 21, 2003, the Debtor and Chad Cochener, individually and on behalf of the remaining Defendants, signed and filed a Motion and Order Requesting Court to Reconsider and Set Aside Judgment. [Adversary No. 02–3261, Docket No. 10.]

71. The Trustee filed a Response to Defendant's Motion to Reconsider and Set Aside on March 18, 2003. [Adversary No. 02–3261, Docket No. 11.]

72. The Debtor and Chad Cochener then filed additional post-judgment filings. [Adversary No. 02–3261, Docket Nos. 14, 15, 16, 18, 19, 20.]

73. On May 28, 2004, Judge Greendyke signed the Order Denying Motion to Reconsider and Set Aside. [Adversary No. 02–3261, Docket No. 21.]

74. On June 17, 2004, the Defendants filed their Objection and Response to Order Denying Motion and Order Requesting Court to Reconsider and Set Aside [sic] Judgment and Order to Set Aside Judgment and Contest Relief Requested in Motion of Denial to Rehearing According to FRBP 7008. [Adversary No. 02–3261, Docket No. 23.]

75. On June 25, 2004, the Defendants filed a Motion for New Trial. [Docket No. 24.]

76. On July 1, 2004, a hearing on the Defendants' Motion for New Trial was set for July 20, 2004. [Adversary No. 02–3261, Docket No. 25.]

77. On July 16, 2004, the Trustee filed his Response to Defendants' Objection to Order Denying Motion Requesting Court to Set Aside Judgment and Motion for New Trial. [Adversary No. 02–3261, Docket No. 28.]

78. On July 19, 2004, the Defendants filed a Motion for Continuance of the July 20, 2004 hearing on the Defendants' Motion for New trial, claiming that the Defendants received "an Objection" from the Trustee's attorney on July 16, 2004, and that the Defendants required "additional time in order to prepare a response in regards to the hearing which is set for tomorrow July 20, 2004." [Adversary No. 02–3261, Docket No. 29.]

79. On July 20, 2004, the Court held the hearing on the Defendants' Motion for New Trial, denied the Defendants' Motion for Continuance of the hearing, and also denied the Defendants' Motion for New Trial.

80. Additionally, on July 20, 2004, the Defendants filed their Objections and Response to Trustee's Response to Defendants' Objection to Order Denying Motion Requesting Court to Set Aside Judgment and Motion for New Trial. [Adversary No. 02–3261, Docket No. 34.]

81. On July 27, 2004, Judge Greendyke signed an Order Denying All Post Judgment Motions Filed by Defendants, including their Motion for New Trial. [Adversary No. 02–3261, Docket No. 35.]

82. On July 28, 2004, the Defendants filed a Motion for Extension of Time to File a Notice of Appeal [Adversary No. 02–3261, Docket No. 36], which Judge Greendyke granted. [Adversary No. 02–3261, Docket No. 37.]

83. On August 26, 2004, the Defendants filed their Notice of Appeal. [Adversary No. 02–3261, Docket No. 40.]

84. The appeal was assigned Civil Action No. 4:04–cv–4261, and assigned to the Honorable Sim Lake, United States District Judge for the Southern District of Texas, Houston Division. [Adversary No. 02–3261, Docket No. 40.]

85. On May 18, 2005, the Trustee filed a Motion to Dismiss Appeal, asserting that the District Court lacked jurisdiction to hear an appeal filed after the ten-day time period provided by Federal Rule of Bankruptcy Procedure (Bankruptcy Rule) 8002. [Civil Action No. 4:04–cv–4261, Docket No. 17.]

86. On May 24, 2005, the Defendants/Appellants filed their Motion for Expedited Extension of Time to File Answer to Appellee's Brief, Extension of Time to File Opposition to Motion to Supplement Transcript, and Extension of Time to File Opposition to Trustee's Motion

to Dismiss Appeal [Civil Action No. 4:04–cv–4261, Docket No. 20], which Judge Lake granted on May 25, 2005, allowing the Defendants/Appellants until June 13, 2005 to file their Answer to the Trustee's Appellee's Brief, Opposition to the Trustee's Motion to Dismiss Appeal, and Opposition to Trustee's Motion to Supplement Transcript. [Civil Action No. 4:04–cv–4261, Docket No. 21.]

87. On June 13, 2005, the Defendants/Appellants filed another Motion for Expedited Extension of Time to File Answer to Appellee's Brief, Extension of Time to File Opposition to Motion to Supplement Transcript, and Extension of Time to File Opposition to Trustee's Motion to Dismiss Appeal [Civil Action No. 4:04–cv–4261, Docket No. 22], which Judge Lake granted in part on June 14, 2005, allowing the Defendants/Appellants until June 22, 2005 to file the documents. [Civil Action No. 4:04–cv–4261, Docket No. 23.]

88. On June 22, 2005, the Defendants/Appellants filed yet another Motion for Expedited Extension of Time to File Answer to Appellee's Brief, Extension to File Opposition to Motion to Supplement Transcript, and Extension of Time to File Opposition to Trustee's Motion to Dismiss Appeal, with the following phrase handwritten under the title of this pleading: "Motion to File Before Clerk's Office Opens on 23rd." [Civil Action No. 4:04–cv–4261, Docket Nos. 24, 25.] [15]

89. On June 30, 2005, Judge Lake signed a Memorandum Opinion and Order granting the Trustee's Motion to Dismiss Appeal in part with respect to: (1) Judge Greendyke's February 11, 2003 Judgment against the Defendants/Appellants [*see* Finding of Fact No. 68]; and (2) Judge Greendyke's May 28, 2004 Order Denying Motion to Reconsider and Set Aside the Judgment signed on February 11, 2003. [*See* Finding of Fact No. 73; Civil Action No. 4:04–cv–4261, Docket Nos. 26, 27; Adversary No. 02–3261, Docket No. 47, 48.] Judge Lake also denied the Trustee's Motion to Dismiss Appeal with respect to Judge Greendyke's July 27, 2004 Order Denying All Post Judgment Motions. [*Id.; see* Finding of Fact No. 81.] Judge Lake then affirmed Judge Greendyke's July 27, 2004 Order Denying All Post Judgment Motions and dismissed the Defendants'/Appellants' appeal for lack of subject matter jurisdiction. *Id.* Judge Lake also granted the Defendants'/Appellants' Motion to File Before the Clerk's Office Opened on June 23, 2005 and denied the Defendants'/Appellants' remaining motion for extension of time. [Civil Action No. 4:04–cv–4261, Docket Nos. 26, 27; Adversary No. 02–3261, Docket Nos. 47, 48; *see* Finding of Fact No. 88.]

90. The Defendants did not appeal Judge Lake's Final Judgment.

91. The Debtor and Chad Cochener lived in and on the Real Properties

---

**15.** It appears that the Defendants'/Appellants' Motion for Expedited Extension of Time to File Answer to Appellee's Brief, Extension to File Opposition to Motion to Supplement Transcript, and Extension of Time to File Opposition to Trustee's Motion to Dismiss Appeal, Motion to File Before Clerk's Office Opens on 23rd was docketed twice at Docket Nos. 24 and 25 in Civil Action No. 4:04–cv–4261.

until the Trustee filed a forcible entry and detainer action, which was set for hearing on September 13, 2005.

92. On September 12, 2005, attorney Travis Crowder (Crowder) telephoned Eisen, the Trustee's attorney. Crowder stated that he represented the Debtor and Chad Cochener and that they wanted to surrender the Real Properties rather than appear at the hearing on the forcible detainer action scheduled on the following day. Crowder and Eisen's paralegal, Bill Bevan (Bevan), arranged for Bevan to obtain the keys the following morning.

93. On September 13, 2005, Bevan received the keys to the Real Properties from Crowder. Bevan immediately telephoned Janet Webster (Webster), the realtor hired by the Trustee to sell the Real Properties. That same day, on September 13, 2005, Bevan and Webster went to the Real Properties, where they met a locksmith, who changed the locks, and where Webster photographed both Real Properties. [Docket No. 131, pp. 154:14–155:1; Trustee's Exhibit Nos. 32, 33.]

94. Upon inspecting the Real Properties, Webster found that the houses on both Real Properties emitted an offensive odor and that garbage and food had been strewn throughout the interiors of both Real Properties. [Docket No. 131, p. 157:15–22; Trustee's Exhibit Nos. 32, 33.] Certain fixtures and appliances had also been removed from the Real Properties. At the Westlock Property, a pedestal sink and an air conditioner condenser were missing. [Docket No. 131, p. 160:7–14.] At the Campbellford Property, the patio door was missing, and the mantle had been ripped off the wall. [Docket No. 131, pp. 160:17–161:1.]

95. Additionally, in the Westlock Property, the phrases: "THOU SHALT NOT STEAL OR COVET" and "Thou Shall Not Steal Lie Cheat" were written on walls. [Trustee's Exhibit No. 32.] The phrase: "THOU SHALT NOT STEAL CHEAT" was spelled in wax, as if the wax was melted and poured to spell out the phrase and then allowed to harden on the counter top. *Id.*

96. Similarly, in the Campbellford Property, the following phrases were written on the walls: "You Will Reap Consequences Sow & Reap," "Thou Shall Not Steal Fraud Lie Cheat," "Thou Shalt Not Steal," and "Our Father Forgive Them." [Trustee's Exhibit No. 33.]

97. To move their furniture from the Real Properties, the Debtor and Chad Cochener hired what they termed "day laborers," who did not speak English and therefore could not have written the phrases written on surfaces throughout the Real Properties. [Docket No. 132, pp. 38:25–39:13; 42:4–10; 86:19–89:23.] The Court finds that these "day laborers" did not write these phrases on the Real Properties.

98. The Debtor and Chad Cochener did not return to inspect or lock either of the Real Properties after the "day laborers" moved their furniture. [Docket No. 132, pp. 41:23—42:3; 55:9–56:2; pp. 88:25–90:1.]

99. After the Trustee gained possession of the Real Properties and inspected them, the Trustee filed a

claim with Crawford & Company, the insurance company that insured the Real Properties. [Docket No. 74, ¶ 7.] After reviewing the Real Properties, Crawford & Company made a net offer of $10,297.72 to settle the estate's claim for the vandalism. *Id.* The offer of $10,297.72 reflected a replacement value of $14,468.62, less depreciation of $3,170.90, and less a deductible of $1,000.00. [Docket No. 74, ¶, n. 2.] The Trustee hired an independent contractor to evaluate the damage and determine whether Crawford & Company's offer was reasonable and fair. [Docket No. 74, ¶ 8.] The independent contractor determined that the offer was reasonable and fair. *Id.*

100. On May 2, 2006, the Trustee filed his Motion for Authority and Application to Compromise Controversy with Crawford & Company, seeking to release Crawford & Company from any liability associated with the estate's insurance claim for vandalism on the Real Properties for the offered amount of $10,297.72. [Docket No. 74.] No opposition to the Trustee's Motion for Authority and Application to Compromise Controversy was filed.

101. On May 9, 2006, Eisen sent a letter to Barry informing him that the Trustee would file a Motion for Sanctions against him. [Trustee's Exhibit No. 13.]

102. On May 9, 2006, Barry responded to Eisen's letter and requested her to advise him under which sections of Bankruptcy Rule 9011 she wished to seek sanctions and provide an itemization of the specific damages suffered by the Trustee. [Trustee's Exhibit No. 14.]

103. On May 11, 2006, Eisen responded to Barry's letter discussing his sanctionable conduct and reviewing the damages suffered by the Trustee. [Trustee's Exhibit No. 15.]

104. On May 16, 2006, Barry responded to Eisen's May 11, 2006 letter by stating, among other things, that "I believe my brief representation of Ms. Cochener was in accordance with acceptable practice." [Trustee's Exhibit No. 16.]

105. On May 16, 2006, Eisen sent Barry a letter informing him that the Trustee had instructed her to file the Motion for Sanctions no later than May 23, 2006 and giving Barry an opportunity until that date to make a settlement offer to the Trustee. [Trustee's Exhibit No. 17.]

106. On May 31, 2006, this Court signed its Order for Authority to Compromise Controversy, ordering that the Trustee was authorized to: (1) accept Crawford & Company's insurance settlement amount of $10,297.72; and (2) release Crawford & Company from any further liability for the vandalism claim on the Real Properties. [Docket No. 76.]

107. On June 15, 2006, Eisen sent Barry a letter transmitting the Motion for Sanctions and informing him that the Trustee had instructed her to file the motion if Barry did not make a settlement offer by 5:00 p.m. the following day. [Trustee's Exhibit No. 18.]

108. On June 19, 2006, the Trustee filed his Motion for Sanctions Against Barry for Causing Unnec-

essary Delay and Expense to the Estate (the Trustee's Motion for Sanctions or the Motion for Sanctions). [Docket No. 78.]

109. On July 7, 2006, Barry filed: (1) his Motion to Dismiss Trustee's Motion for Sanctions Against Barry for Causing Unnecessary Delay and Expense to the Estate (Barry's Motion to Dismiss the Trustee's Motion for Sanctions) [Docket No. 79]; and (2) the Response of Barry to Trustee's Motion for Sanctions Against Barry for Causing Unnecessary Delay and Expense to the Estate. [Docket No. 80.]

110. On July 28, 2006, the Trustee filed the Trustee's Response to Barry's Motion to Dismiss Trustee's Motion for Sanctions Against Barry for Causing Unnecessary Delay and Expense to the Estate. [Docket No. 84.]

111. Beginning on August 31, 2006, the Court held the Sanctions Hearing, considering the Trustee's Motion for Sanctions [Docket No. 78] and Barry's Motion to Dismiss the Trustee's Motion for Sanctions. [Docket No. 79.] After hearing certain testimony on this day, this Court expressed its concern about the Debtor's failure to appear at the continued Meetings of Creditors and the 2004 Examination, as well as the Debtor's involvement in the destruction of property of the bankruptcy estate (i.e. the Real Properties). This Court therefore continued the Sanctions Hearing until September 27, 2006 so as to provide sufficient time to issue a show cause order requiring the Debtor, her son Chad Cochener, and Hawks to appear and show cause why sanctions should not be issued for abuse of the bankruptcy process and destruction of property of the Chapter 7 estate.

112. On September 1, 2006, this Court issued an Order (1) Requiring Beverly Cochener, Chad Cochener, and Jason Hawks to Appear in Court at 8:30 a.m. on Wednesday, September 27, 2006 to Give Testimony at the Continuation of the Hearing on the Trustee's Motion for Sanctions Against David Barry for Causing Unnecessary Delay and Expense to the Estate; (2) Requiring Beverly Cochener to Appear in Court at 8:30 a.m. on Wednesday, September 27, 2006 to Show Cause Why She Should Not be Sanctioned for Abuse of the Bankruptcy Process and/or Defrauding the Court; and (3) Requiring Beverly Cochener and Chad Cochener to Appear in Court at 8:30 a.m. on Wednesday, September 27, 2006 to Show Cause Why One or Both of Them Should Not be Sanctioned for Destruction of Property of the Bankruptcy Estate (the Show Cause Order). [Docket No. 95.]

113. On September 27, 2006, this Court heard additional testimony relating to the Motion for Sanctions and the Show Cause Order. The Court continued the Sanctions Hearing until September 28, 2006.

114. On September 28, 2006, the Court continued to hear additional testimony relating to the Motion for Sanctions and the Show Cause Order. The Court continued the Sanctions Hearing until October 20, 2006.

115. At the Sanctions Hearing, when counsel for the Trustee asked

Barry whether he had been sanctioned in the Bankruptcy Court for the Southern District of Texas, in "the *Thomas* case with Judge Steen," Barry indicated that he had. [Docket No. 137, pp. 5:19–6:2.] Barry further testified that he had been sanctioned in a case "in Judge Isgur's Court that had to do with the new local form." [Docket No. 137, p. 6:3–7.] The Court finds that within the past year Barry has already been sanctioned twice, with one sanction having come from Judge Steen and the other having come from Judge Isgur.

116. Pursuant to Federal Rule of Evidence 201(a), (b), and (c),[16] this Court takes judicial notice of the sanctions ordered against Barry by the Honorable Wesley W. Steen, U.S. Bankruptcy Judge for the Southern District of Texas, Houston Division in *In re Thomas*, 337 B.R. 879 (Bankr.S.D.Tex. 2006). [Case No. 03–43814, Docket Nos. 119, 120.] Judge Steen found that sanctions were appropriate because:

[Barry] has prepared, signed, and filed a false petition, an improper Chapter 13 plan summary and chapter 13 plan, an objection to claim and related memoranda without factual or legal basis, and a proof of claim and has advocated all of those for improper purpose and knowing that they were factually incorrect . . . .

*Thomas*, 337 B.R. at 895. [Case No. 03–43814, Docket No. 119.]

117. Judge Steen sanctioned Barry by (a) requiring Barry to take tutoring of no less than 10 hours in legal ethics, and (b) forwarding a copy of the Court's Memorandum Findings of Fact and Conclusions of Law Regarding Order Vacating Confirmation of Chapter 13 Plan and Imposing Sanctions Under Rule 9011 to the United States Attorney and the State Bar of Texas for appropriate consideration. *Id.*

118. On February 17, 2006, Barry filed his Notice of Appeal of Judge Steen's Order Vacating Confirmation of Chapter 13 Plan and Imposing Sanctions Under Rule 9011. [Case No. 03–43814, Docket No. 123.]

119. On April 26, 2006, Barry filed his Submission of Proposal in Compliance with Order Vacating Confirmation of Chapter 13 Plan and Imposing Sanctions Under Rule 9011. [Case No. 03–43814, Docket No. 136.]

120. On August 15, 2006, Judge Steen's Order was affirmed by the Honorable Kenneth M. Hoyt, United States District Judge for the Southern District of Texas, Houston Division. [Civil Action No. 4:06–cv–00613, Docket Nos. 13, 14.]

121. In his Memorandum Opinion and Order, Judge Hoyt stated:

It is evident from the record that Barry intentionally defrauded the Bankruptcy Court. The court only became aware of Barry's false statement when at a hearing he stated "I was trying to obviously get jurisdiction over [the IRS] to make sure something did not survive the Chapter 13 discharge." Barry intended for the

---

**16.** The Federal Rules of Evidence apply to bankruptcy proceedings pursuant to Bankruptcy Rule 9017 and Federal Rule of Evidence 1101(a), (b).

Bankruptcy Court's order to discharge the amount owed to the IRS. Hence, the Bankruptcy Court had the authority to revoke the confirmation [of the] Plan, particularly when it is procured by fraud. *See* 11 U.S.C. § 1330. The court, therefore, rejects appellants' contentions concerning the revocating of the Plan.

. . . .

The facts indicate that Barry was not forthcoming with the court. Moreover, the documents prepared and signed by his clients under perjury of law represented to the court that the IRS claim was "$0.00" then $20,000, and finally $5,000. Barry admitted that he gave a vague explanation even though he knew the true amount claimed. In fact, the IRS had notified Barry of the amounts claimed, nevertheless, Barry ignored the notices and made false statements to the court. The Court, therefore, affirms the Bankruptcy Court's sanctions award. [Civil Action No. 4:06–cv–00613, Docket No. 13, pp. 6–8 (emphasis added).]

122. Barry has appealed Judge Hoyt's Final Judgment to the Fifth Circuit Court of Appeals, where it is currently pending. [Civil Action No. 4:06–cv–00613, Docket Nos. 15, 16.]

123. Pursuant to Federal Rule of Evidence 201(a), (b), and (c), this Court takes judicial notice of the sanctions entered on May 5, 2006 against Barry by the Honorable Marvin Isgur, United States Bankruptcy Judge for the Southern District of Texas, Houston Division in Case No. 05–95207, *In re: Oliver J. Anderson* and in Case No. 06–30779. *In re: Carla Jean Deblaw.* [Case No. 05–95207, Docket No. 57; Case No.06–

30779, Docket No. 57.] In his Memorandum Opinion and Order Imposing Sanctions on Debtors' Counsel and Denying Attorney's Fees for Violation of Local Bankruptcy Rule 3015, Judge Isgur found that Barry made substantive alterations to the Uniform Plan promulgated by the Bankruptcy Court that Barry submitted as the proposed Chapter 13 plans in the *Anderson* and *Deblaw* cases. *See* Bankruptcy Local Rule 3015. [Case No. 05–95207, Docket No. 57; Case No. 06–30779, Docket No. 57.] In sanctioning Barry, Judge Isgur wrote that "The plan summary in the present cases contained no reference to counsel's changes to the Uniform Plan. To substantively change a plan, that is uniform by definition, makes reliance on a uniform plan summary misleading and even irresponsible. Counsel cannot have believed such a situation was allowable under the local rules." *Id.* Judge Isgur sanctioned Barry in the amount of $500.00 in each case and ordered that Barry not seek any fees for his work in the cases prior to the confirmation of the proposed plans. *Id.* Barry did not appeal Judge Isgur's Order.

124. The Westlock Property was uninhabitable when the Trustee's realtor inspected it. Had the Westlock Property been in good condition and properly maintained by the Debtor and Chad Cochener, then it would have sold for between $110,000.00 and $125,000.00. [Docket No. 131, pp. 163:25–164:7.] The Westlock Property actually sold for $85,000.00. [Docket No. 131, p.

164:8–9.] The Westlock Property had a lien on it for $60,000.00. [Docket No. 131, p. 164:10–13.] Therefore, the estate received $25,000.00 from the sale of the Westlock Property. However, had the Debtor and Chad Cochener maintained the Westlock Property, the estate could have received between $50,000.00 and $60,000.00 from the sale of this property.

125. The Trustee had determined that the Campbellford Property needed to sell for no less than $110,000.00 in order to pay off liens on the property and other related costs. [*See* Docket Nos. 71; 131, pp. 163:12–24, 164:15–17.] The Trustee was unable to sell the Campbellford Property for $110,000.00 because it is worth less than this amount in its current condition. [Docket No. 131, pp. 163:12–164:3.] Had the Debtor and Chad Cochener maintained the Campbellford Property, it would have been worth $135,000.00. [Docket No. 131, p. 164:15–19.] Therefore, after paying off the liens, the estate could have received a net of $25,000.00 from the sale of the Campbellford Property.

126. The Trustee ultimately filed a Notice of Abandonment of the Campbellford Property on October 31, 2006,[17] stating that he was abandoning the Campbellford Property as burdensome and of inconsequential or no value to the estate because the indebtedness on the property was higher than the value of the property. [Docket No. 114.]

127. The Trustee incurred reasonable attorney's fees and costs of $7,613.75 and $704.47, respectively, in dealing with: (1) the Debtor's Motion to Dismiss; (2) the Debtor's and Barry's refusal to appear at the continued Meetings of Creditors; and (3) obtaining documents that the Trustee requested so that he could carry out his duties as Trustee. [Trustee's Exhibit No. 25.]

128. Additionally, the Trustee incurred reasonable attorneys fees and costs of $15,587.50 and $1,064.92, respectively, in prosecuting the Motion for Sanctions. [Trustee's Exhibits Nos. 26, 26A.]

129. On October 25, 2006, this Court announced its findings of fact and conclusions of law from the bench regarding the Trustee's Motion for Sanctions, the Debtor's Motion to Dismiss the Trustee's Motion for Sanctions, and the Show Cause Order. To the extent that the oral Findings of Fact and Conclusions of Law contradict or are inconsistent with the written Findings of Fact and Conclusions of Law set forth herein, these written Findings of Fact and Conclusions of Law shall govern.

## III. CREDIBILITY OF WITNESSES

The Court heard testimony from the following witnesses: Ronald Sommers, Mynde Eisen, David Barry, Bill Bevan, Jason Hawks, Beverly Cochener, Chad Cochener and Janet Webster.

The Court finds Mr. Sommers, Ms. Eisen, Mr. Bevan, Mr. Hawks, and Ms. Webster to all be credible witnesses. The Court further finds that the Debtor gave

---

**17.** The Trustee abandoned the Campbellford Property after the Sanctions Hearing.

credible testimony concerning the extent of her reliance on her attorneys; however, the Debtor was less than credible on most other issues. With respect to Chad Cochener, the Debtor's son, the Court finds his testimony to be without any credibility. Finally, Mr. Barry was overly evasive and not as credible as this Court would hope a board certified attorney and officer of this Court would be.

## IV. CONCLUSIONS OF LAW

### A. Jurisdiction and Venue

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(2)(A). Venue is proper pursuant to 28 U.S.C. § 1408.

### B. Trustee's Motion for Sanctions Against Barry

#### 1. Under Bankruptcy Rule 9011, sanctions may not be awarded against Barry.

Bankruptcy Rule 9011(c)(1)(A) states:

A motion for sanctions under this rule shall be made separately from other motions or requests and shall describe the specific conduct alleged to violate subdivision (b). It shall be served as provided in Rule 7004. The motion for sanctions may not be filed with or presented to the court unless, within 21 days after services of the motion (or such other period as the court may prescribe), the challenged paper, claim, defense, contention, allegation or denial is not withdrawn or appropriately corrected, except that this limitation shall not apply if the conduct alleged is the filing of a petition in violation of subdivision (b).

■ On May 9, 2006, Eisen sent a letter to Barry reviewing his conduct and informing him that the Trustee would file a motion for sanctions. [Finding of Fact No. 101.][18] Bankruptcy Rule 9011 requires a challenge to a "paper, claim, defense, contention, allegation or denial," all of which can be withdrawn. The purpose of Bankruptcy Rule 9011 is to address a pleading filed, a position taken, or an allegation made that is absolutely wrong and lacks any basis. This is why opposing counsel is permitted to rectify through withdrawal or correction under the Rule.

■ In the case at bar, the Trustee did not send a letter in 2001 threatening sanctions unless Barry withdrew the Motion to Dismiss for containing knowingly false statements. Had such a letter been sent, and nothing done in response, then a motion for sanctions under Bankruptcy Rule 9011 would have been appropriate because Barry would have had the opportunity to withdraw the Motion to Dismiss. The Court acknowledges that, in 2001, the Trustee should not have needed to spend time attempting to convince Barry to do what was required of him as a matter of law: namely, to cooperate with the Trustee and not put up barriers to impede his investigation and administration of assets belonging to the estate. However, under Bankruptcy Rule 9011, the Trustee had to

---

**18.** Eisen's letter alleged Federal Rule 11 as the grounds for sanctions and made no reference to Bankruptcy Rule 9011. [Trustee's Exhibit No. 13.] Barry emphasized at the Sanctions Hearing that Eisen made no reference to Bankruptcy Rule 9011, and Barry's counsel argued that Eisen's failure to cite Rule 9011 barred the Trustee from obtaining sanctions against Barry. The Court does not find Barry's point to be particularly persuasive because when he responded to Eisen in his letter of May 16, 2006, Barry requested under which section of Bankruptcy Rule 9011 Eisen planned to proceed [Trustee's Exhibit No. 16]; hence, Barry obviously believed Eisen was relying upon Rule 9011. In any event, the issue is moot because the Court finds that neither Federal Rule 11 nor Bankruptcy Rule 9011 is an appropriate basis for sanctions in this case.

have given Barry notice in 2001 to withdraw the Motion to Dismiss or else be subject to a motion for sanctions. Since the Trustee did not give Barry an opportunity to withdraw the Motion to Dismiss in 2001,[19] this Court finds that Bankruptcy Rule 9011 is not presently an appropriate ground for sanctions.

2. **The unavailability of sanctions under Bankruptcy Rule 9011 does not, however, preclude this Court from using its inherent powers under 11 U.S.C. § 105 as an alternative basis for imposing sanctions against Barry.**

As an alternative basis for sanctions, the Motion for Sanctions cited 11 U.S.C. § 105. [Docket No. 78, ¶ 28.] The powers derived by a bankruptcy court under § 105 are the same inherent powers discussed by the Supreme Court in *Chambers v. NASCO*, 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). *See, e.g., Caldwell v. Unified Capital Corp. (In re Rainbow Magazine, Inc.)*, 77 F.3d 278, 283–84 (9th Cir.1996) ("Congress impliedly recognized that bankruptcy courts have the inherent power to sanction that *Chambers* recognized exists within Article III courts.... 'We believe, and hold, that § 105 intended to imbue the bankruptcy courts with the inherent power recognized by the Supreme Court in *Chambers*.'" (quoting *Jones v. Bank of Santa Fe (In re Courtesy Inns. Ltd.)*, 40 F.3d 1084, 1089 (10th Cir.1994))).

▪▪▪ In *Chambers*, the Supreme Court stated that a federal court's inherent power to sanction bad faith conduct serves the dual purpose of covering the gaps where there are no applicable rules and also covering situations where "neither the statute nor the Rules are up to the task." *Cham-*

*bers*, 501 U.S. at 50, 111 S.Ct. 2123. Thus, although inherent powers are used when the conduct is not subject to the Rules, "neither is a federal court forbidden to sanction bad-faith conduct by means of the inherent power simply because that conduct could also be sanctioned under the statute or the Rules." *Id.* Further, the Supreme Court pointed out that:

> Much of the bad-faith conduct by Chambers, however, was beyond the reach of the Rules; his entire course of conduct throughout the lawsuit evidenced bad faith and an attempt to perpetrate a fraud on the court *and the conduct sanctionable under the Rules was intertwined within conduct that only the inherent power could address.* In circumstances such as these in which all of a litigant's conduct is deemed sanctionable, requiring a court first to apply Rules and statutes containing sanctioning provisions to discrete occurrences before invoking inherent power to address remaining instances of sanctionable conduct would serve only to foster extensive and needless satellite litigation, which is contrary to the aim of the Rules themselves.

*Id.* at 51 (citations omitted and emphasis added).

▪▪▪ As discussed in detail in section IV(B)(7) below, this Court imposes sanctions against Barry for five different actions that he took. Of these actions, only the Motion to Dismiss, which included blatantly false factual and legal contentions, would have been subject to Bankruptcy Rule 9011. The remainder of the actions were not related to positions Barry took before this Court, but rather involved either advice to the Debtor or communications with the Trustee. It is clear that this

---

**19.** The Trustee did not take the decision whether to seek sanctions against Barry light-

ly. [*See* Finding of Fact No. 56.]

mixed conduct is the exact situation to which *Chambers* referred as being "intertwined" and appropriate for sanctioning solely under the umbrella of inherent powers. Thus, even if hypothetically part of Barry's conduct was appropriately sanctionable under Bankruptcy Rule 9011 and the Trustee had complied with the safe harbor provisions prior to filing the Motion for Sanctions, this Court would still have the authority to forego Bankruptcy Rule 9011 and simply sanction all of the intertwined conduct solely under this Court's inherent power. Furthermore, when conduct subject to scrutiny under Bankruptcy Rule 9011 is not sanctionable under that Rule because the party seeking sanctions failed to comply with its provisions, that conduct is not then immunized from all sanctions. Rather, *Chambers* permits a court in such circumstances to use its inherent powers because the Rules are "not up to task." *Chambers*, 501 U.S. at 50, 111 S.Ct. 2123.

The vagueness of the phrase "up to task" was addressed, on facts similar to those presently before the Court, in *First Bank of Marietta v. Hartford Underwriters Insurance Company*, 307 F.3d 501 (6th Cir.2002). In *First Bank of Marietta*, the district court ruled that Rule 11 was unavailable to sanction certain conduct that had been raised because the movant who filed the motion for sanctions failed to comply with Rule 11's safe harbor filing requirements. *Id.* at 510. Nevertheless, the district court included that conduct, along with other conduct that would not have been subject to Rule 11, in a single order for sanctions based on the court's inherent powers in *Chambers*. *Id.* at 509–11. The Sixth Circuit first pointed out that the failure to comply with Rule 11 was not fatal because the conduct under Rule 11 was "intertwined" with conduct which was not subject to Rule and that, pursuant to *Chambers*, the district court was correct in considering the entirety of the conduct

under inherent powers. *Id.* at 513. The Sixth Circuit also pointed to language in *Chambers* which implies that, if conduct is "intertwined," it is not necessary for the court to first apply the Rules or statutes before relying upon its inherent powers because such a rule " 'would serve only to foster extensive and needless satellite litigation, which is contrary to the aim of the Rules themselves.' " *Id.* at 516 (quoting *Chambers*, 501 U.S. at 50–51, 111 S.Ct. 2123). The Sixth Circuit continued: "Where, as here, the offending party's conduct extends through the proceedings, Rule 11 remedies would not address the injury that the district court sought to remedy that included withholding evidence, the consequences of the withholding, violating discovery orders and extending the proceedings." *Id.* at 517. Thus, the Sixth Circuit concluded that since the district court had the authority to rely upon its inherent powers due to the "intertwined" and pervasive nature of the sanctionable conduct, any failures of Rule 11 were irrelevant. *Id.* at 518.

In the case at bar, the factual scenario is essentially the same; much of Barry's conduct is not within the scope of Bankruptcy Rule 9011, but rather is intertwined with conduct that is inappropriate but not subject to Bankruptcy Rule 9011. However, the fact that Bankruptcy Rule 9011 fails to provide a basis to sanction this conduct does not preclude this Court from exclusively relying upon its other authority; namely, its inherent power under *Chambers* and § 105. Further, as subsequently discussed herein, sanctions are also appropriate under 28 U.S.C. § 1927.

**3. The Fifth Circuit, and lower courts within the Fifth Circuit, have expressly held that a bankruptcy court has the power under § 105 to issue sanctions.**

The Fifth Circuit has held that § 105 allows the bankruptcy court to im-

pose sanctions. " § 105 authorizes the bankruptcy court to, sua sponte, 'take any action or make any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.'" *Friendly Fin. Disc. Corp. v. Tucker (In re Tucker)*, 2000 WL 992448 *3 (5th Cir. June 28, 2000) (unpublished opinion); *see also Placid Ref. Co. v. Terrebonne Fuel & Lube (In re Terrebonne Fuel & Lube )*, 108 F.3d 609 (5th Cir.1997) (holding that a bankruptcy court has the power under § 105 to issue sanctions, including civil contempt proceedings, in order to carry out the provisions of the Bankruptcy Code); *Mooney v. Green Tree Serv., Inc., (In re Mooney )*, 340 B.R. 351, 360–61 (Bankr.E.D.Tex.2006) (reiterating the 5th Circuit's broad reading of § 105 in assessing "civil sanctions" under § 105 for violations of the discharge injunction). District courts within the Fifth Circuit have further found that attorneys can also be sanctioned under § 105. "[T]he bankruptcy judge has broad powers under title 11 to prevent an abuse of the bankruptcy process, which includes 'the power to issue and [sic] order to sanction an attorney.'" *Boren Swindell & Assocs., L.L.P. v. Friedman*, 2006 WL 739990 *2, 2006 U.S. Dist. LEXIS 12305 *6 (N.D.Tex. March 23, 2006) (citing § 105 and *In re Volpert*, 110 F.3d 494, 500 (7th Cir.1997)). Indeed, one district court has noted that even if Rule 11 does not provide the foundation for imposing sanctions against an attorney, § 105 can be used "to fill in the interstices where Rule 11's provisions are inapplicable." *Hamm v. Hiler (In re Smyth )*, 242 B.R. 352, 360 (W.D.Tex. 1999).[20]

Barry makes the unsupported argument that a bankruptcy court's inherent powers are limited to enforcing its own orders. [Docket No. 120, ¶ 119.] There is no case or Bankruptcy Code section cited for this proposition. *Chambers* dealt with the bad faith conduct of an attorney during litigation, and its holding is in no way limited to the enforcement of a court order.

**4. The Trustee has the burden of proof to establish that this Court should grant his Motion for Sanctions, and the standard is by a preponderance of the evidence given the circumstances in this case.**

The Supreme Court has required "proof by clear and convincing evidence where particularly important individual interests or rights are at stake." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 389, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). However, "imposition of even severe civil sanctions that do not implicate such interests has been permitted after proof by a preponderance of the evidence." *Id.* at 389–90, 103 S.Ct. 683 (citing *United States v. Regan*, 232 U.S. 37, 48–49, 34 S.Ct. 213, 58 L.Ed. 494 (1914)).

A good example of an "important individual interest or right" requiring clear and convincing evidence was articulated in *Crowe v. Smith*, 261 F.3d 558 (5th Cir. 2001). There, the Fifth Circuit reversed and rendered a district court's order sanctioning certain attorneys by suspending them from the practice of law for three months. *Id.* at 566. The district court had taken such action under its inherent

---

**20.** Although the district court made reference to Rule 11 throughout the opinion, the court was actually referring to Bankruptcy Rule 9011. In the opinion, the court expressly notes that "The standards governing both provisions are generally the same. Therefore, for ease of reference the Court will not distinguish between cases construing Rule 11 and those construing Bankr.R. 9011." *Id.* at 358 n. 3.

powers. In its ruling, the Fifth Circuit stated that:

> A district court has inherent power to sanction attorneys for bad faith conduct in litigation; we review the exercise of this power for abuse of discretion. A court abuses its discretion when its finding of bad faith is based on an erroneous view of the law or a clearly erroneous assessment of the evidence. *In attorney suspension and disbarment cases, the finding of bad faith must be supported by clear and convincing proof.* Clear and convincing proof is a high standard, requiring more than a preponderance of the evidence.

*Id.* at 563 (citations omitted and emphasis added).

■ The holding in *Crowe* suggests that in the Fifth Circuit, when a court imposes sanctions on attorneys using its inherent powers, the standard is a preponderance of evidence unless the sanction is disbarment or suspension, in which event the standard is clear and convincing proof. The undersigned bankruptcy judge interprets *Crowe*, in conjunction with *Huddleston,* as providing that the general rule for sanctions is preponderance of the evidence for two reasons. First, the Supreme Court has expressly stated that clear and convincing evidence applies only where "important individual interests or rights are at stake." *Huddleston,* 459 U.S. at 389, 103 S.Ct. 683. There is no question that disbarment is an important individual interest; whereas, preponderance of the evidence applies when the relief that is requested is the

"imposition of ... severe civil sanctions that do not implicate such [individual] interests." *Id.* at 389–90, 103 S.Ct. 683. It would seem that sanctions in the form of attorney's fees and costs (which is the form of sanctions which the Trustee seeks in the case at bar) fit into this category because reimbursing the prevailing movant his fees and expenses does not implicate such an important individual interest as being disbarred. Second, the Fifth Circuit would not otherwise have expressly stated that clear and convincing proof is required "[i]n attorney suspension and disbarment cases." *Crowe,* 261 F.3d at 563. If the Fifth Circuit had meant to hold that clear and convincing proof is required in all instances when district courts are using inherent powers to impose monetary sanctions, the Fifth Circuit would have so stated. By expressly linking clear and convincing proof to attorney suspension and disbarment cases, the Fifth Circuit seemed to be telegraphing that any other type of sanction imposed under inherent powers may be done so by a preponderance of the evidence.

■ In the case at bar, the Motion for Sanctions does not request that this Court disbar or suspend Barry nor does this Court intend to impose such sanctions.[21] The Motion for Sanctions requests that this Court sanction Barry by requiring him to pay the fees and expenses incurred by the Trustee in defeating the Motion to Dismiss and in prosecuting the Motion for Sanctions. Because the relief sought against Barry is not disbarment or suspen-

---

21. This Court has no power to do so in any event. Under Rule 5(A) of Appendix A (Rules of Discipline) of the Local Rules for the United States District Court for the Southern District of Texas, if the undersigned bankruptcy judge believes that the conduct of any attorney merits suspension of that attorney's license to practice in this district, then this Court must notify the Chief Judge of the Southern District of Texas, with a copy of such notice to the Clerk of Court. Under Rule 5(B), "the chief judge shall refer any non-frivolous charge to a district judge for review to determine whether further disciplinary proceedings should be held. The reviewing judge shall notify the charged lawyer of the charges made and give that lawyer an opportunity to respond."

sion, this Court concludes that the standard of proof for the Trustee to prevail on his Motion for Sanctions is by a preponderance of the evidence. This Court's conclusion is supported by at least one other court. *See In re Silberkraus*, 253 B.R. 890, 913–14 (Bankr.C.D.Cal.2000); *but see Shepherd v. Am. Broad. Cos.*, 62 F.3d 1469 (D.C.Cir.1995).

Alternatively, if this Court is incorrect in this conclusion, and the standard of proof is clear and convincing evidence,[22] then this Court nevertheless concludes that the Trustee has shown, by clear and convincing evidence, that both the conduct of Barry and the Debtor, plus the Debtor's son, merits sanctions under this Court's inherent powers. The discussion below, which demonstrates the bad faith tactics and bad faith actions of Barry, the Debtor, and the Debtor's son, shows how the Court has reached this conclusion.

### 5. Sanctions against Barry are appropriate under § 105 and this Court's inherent powers.

■ Under § 105 and the Court's inherent powers, this Court concludes that sanctions are appropriate against Barry because his actions constitute bad faith conduct, including the following: (1) Barry concocted a reason for the Debtor not to attend the continued Meeting of Creditors, and then instructed her not to attend this meeting; (2) Barry himself did not attend the continued Meeting of Creditors; (3) Barry filed a Motion to Dismiss the Debtor's case, which included blatantly false factual and legal contentions, for the purpose of delaying and hindering the Trustee's further examination of the Debtor at the continued Meeting of Creditors; (4) Barry drafted a letter to the Trustee, dated October 17, 2001, grossly misstating the law regarding the allowable reach-back period for fraudulent transfers under the Bankruptcy Code in an attempt to mislead the Trustee and avoid having to produce documents; and (5) Barry instructed the Debtor not to produce the documents requested by the Trustee on June 6, 2001, which both prior counsel to the Debtor (i.e., Hawks) and the Debtor herself had already committed to produce.

Sanctions are particularly appropriate in this case because Barry was a board certified attorney in consumer bankruptcy [Docket No 135, p. 6:8–15; Docket No. 131, pp. 55:19–25–56:4; Finding of Fact No. 23] and therefore is held to a higher

---

**22.** This Court might be incorrect because in both *Chaves* and *Elliott*, the Fifth Circuit states that "the threshold for the use of inherent power sanctions is high." *Chaves v. M/V Medina Star*, 47 F.3d 153, 156 (5th Cir.1995); *Elliott v. Tilton*, 64 F.3d 213, 217 (5th Cir. 1995). Neither of these cases involved attorney disbarment or suspension as the sanction; rather, both involved monetary sanctions, just as in the case at bar. It is entirely possible that the Fifth Circuit's statement that "the threshold for the use of inherent power sanctions is high" is meant to convey that the standard for monetary sanctions imposed under inherent powers is clear and convincing evidence. On the other hand, if clear and convincing evidence is the standard when imposing solely monetary sanctions, one would think that the Fifth Circuit would have ex-

pressly so stated as it did in *Crowe*, where the sanctions involved attorney suspension.

This Court would also note that the Fifth Circuit has unequivocally held that a movant in a civil contempt proceeding bears the burden of establishing its case by clear and convincing evidence. *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 581 (5th Cir.2000). Hence, one might use this holding to argue that imposition of sanctions using inherent powers under § 105 also requires a standard of clear and convincing evidence. On the other hand, seeking an order of contempt, which can include incarceration, arguably involves a more "important individual interest" than monetary sanctions in the form of attorney's fees and costs; therefore, this more serious relief should require a higher standard than mere monetary sanctions.

standard than an attorney who is not board certified in bankruptcy. Indeed, the reason that the non-certified Hawks, who concluded that this case was more complex than he originally believed, brought Barry into this case was that Barry was supposed to have more knowledge and expertise in consumer bankruptcy cases than Hawks. [Docket No. 131, pp. 81:22–83:11; Finding of Fact No. 23.] However, as discussed below, instead of bringing a more seasoned approach to the case, Barry abused and disrupted the bankruptcy process and interfered with the Trustee's execution of his duties by using obstructionist tactics which warrant the imposition of sanctions.

**a. Barry concocted a reason for the Debtor not to attend the continued Meeting of Creditors, and then instructed her not to attend this meeting.**

As soon as Barry became involved in this case, he intentionally took action designed to undermine one of the fundamental aspects of a Chapter 7 case: the Trustee's investigation of the assets belonging to the estate an of the Debtor's financial condition. Knowing that the Trustee wanted to examine the Debtor about certain transactions which she had not disclosed [Findings of Fact Nos. 24, 29], and also knowing that the Trustee wanted documents relating to these transactions [Finding of Fact No. 24], Barry filed the Motion to Dismiss, and then took the position that until Judge Greendyke ruled on the Motion to Dismiss, the Trustee could not further examine the Debtor or require her to produce the documents that Hawks and she had already agreed to produce. [Findings of Fact Nos. 38, 40.] Thus, Barry sent the June 18, 2001 letter to the Trustee enclosing the Motion to Dismiss and informing the Trustee that the Debtor would not be attending the continued

Meeting of Creditors on June 20, 2001. [Finding of Fact No. 30.]

After Barry and the Debtor failed to attend the June 20, 2001 meeting, the Trustee sent a letter to Barry stating that the Trustee would reconvene the meeting on August 29, 2001. [Findings of Fact Nos. 36, 37.] In response, Barry sent a letter to the Trustee on August 14, 2001 again stating that neither the Debtor nor he would appear at that continued meeting. [Finding of Fact No. 38.] In the last paragraph of the August 14, 2001 letter, Barry set forth in writing what he had been orally expressing to the Trustee: the Debtor would only attend the continued Meeting of Creditors "[i]n the unlikely event the case is not dismissed ...." *Id.* In other words, for the Debtor to attend the continued Meeting of Creditors, two conditions had to occur: (1) the hearing on the Motion to Dismiss would have to be held; and (2) the Motion to Dismiss would have to be denied.

Barry's contention that the filing of the Motion to Dismiss automatically relieved the Debtor of attending the continued Meeting of Creditors and of producing the documents has absolutely no basis in law. Barry's position that the Debtor was excused from these duties until Judge Greendyke ruled on the Motion to Dismiss was nothing more than a disingenuous attempt to shield the Debtor from further examination by the Trustee in the hope that Judge Greendyke would dismiss the case and thereby deprive the Trustee of the ability to go forward with his investigation. This is not how the bankruptcy system is supposed to operate.

11 U.S.C. § 343 expressly states that "The debtor shall appear and submit to examination under oath at the meeting of creditors under section 341(a) of this title. Creditors, any indenture trustee, any trustee or examiner in the case, or the

United States trustee may examine the debtor." This statute leaves no doubt that "[a]ppearance at a Section 341 meeting is mandatory. It is not waivable." *In re Keiser,* 204 B.R. 697, 700 (Bankr.W.D.Tex. 1996) (citation omitted). If this interpretation is not the plain meaning of the statute, then there is no such thing as a plain meaning. *See United States v. Ron Pair Enters.,* 489 U.S. 235, 242–43, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989).

■ Former Bankruptcy Judge Steven Felsenthal aptly articulated the public policy as to why a debtor must attend the meeting of creditors:

> Section 341(a) of the Bankruptcy Code provides that a creditors' meeting "shall" be held within a reasonable time following the entry of the order for relief. Bankruptcy Rule 2003(a) sets the time frame for the meeting. The debtor "shall" appear at the § 341 meeting and undergo an examination, under oath, by the trustee and the creditors. 11 U.S.C. § 343. *The primary purpose of the § 341 meeting is the examination of the debtor. The § 341 meeting permits the creditors to rigorously question the debtor on issues relating to dischargeability, estate administration, and the debtor's financial affairs. The meeting also allows the trustee to query about possible recoveries under the avoiding powers. Thus, the debtor's presence at the § 341 meeting is not merely ceremonial, but instead plays a pivotal role in providing the creditors and the trustee with valuable information regarding the debtor's financial situation.*

*In re Moore,* 309 B.R. 725, 726 (Bankr. N.D.Tex.2002) (emphasis added).[23]

---

**23.** Courts in some other jurisdictions have carved out an exception which allows the Debtor to be excused from attendance at the meeting of creditors upon a showing of "good cause." *In re Muy Bueno Corp.,* 257 B.R. 843, 849 (Bankr.W.D.Tex.2001) ("Mere inconvenience rarely qualifies as 'good cause' under the case law, however ... [i]llness, a recent job that requires the person to be out of the city, a military person being stationed overseas-all of these have often served as ready examples of good cause.") There is no case law discussing a good cause exception to appearance in the Southern District of Texas. However, there is a form in the local rules styled "In the Matter of Attendance at Creditors Meetings" and titled "Procedures for Obtaining Relief From Required Attendance at § 341 Meetings." *Available at* http://www. txs.uscourts.gov/bankruptcy/rulesformsproc/ 341_meet_attend.pdf. While these procedures are undated, they have been set forth—verbatim—in General Order 2000–5, which is titled, "In the Matter of Excusing Attendance at § 341 Meeting" and is dated April 4, 2000 (A true and correct copy of this General Order is attached to this Memorandum Opinion as Attachment No. 1). Therefore, these procedures have been in place throughout the Debtor's case. Specifically, these procedures provide that any debtor may move for the Court to excuse appearance at the meeting of creditors, but "[i]t is not anticipated that this motion would be granted except when it is impossible for the Debtor to attend, such as in case of the Debtor's death or complete physical or mental incapacity." *Id.* at ¶ 4. Clearly, the standard contemplated in the Southern District of Texas is much higher than those jurisdictions using the good cause test. Further, this form states that if the debtor is unable to obtain the consent of the Trustee to excuse attendance, the debtor may move to dismiss the case for the debtor's inability to attend the meeting of creditors. *Id.* at ¶ 6. Although Barry did file the Motion to Dismiss, the grounds stated were that it was in the best interest of creditors; he did not allege that the Debtor was unable to attend the meeting of creditors due to the Debtor's death or complete physical or mental incapacity. In fact, the major justification provided for not appearing at the continued Meeting of Creditors was simply that the Motion to Dismiss had been filed. Under these circumstances, the form from the Southern District of Texas would not have been applicable because Barry put the cart before the horse by filing the Motion to Dismiss in order to have a reason to not appear at the continued Meeting of Creditors, rather than filing the Motion to Dismiss because there was already a legiti-

The statute and the case law make it eminently clear that the Debtor in this case was required to attend the continued Meeting of Creditors scheduled for June 20, 2001. But there is more. When the Debtor filed her petition, the Clerk of Court, on behalf of the Court, sent the Order for Relief to the Debtor on May 15, 2001. [Finding of Fact No. 12.] This Order expressly states that "[t]he debtor (both husband and wife in a joint case) is required to appear at the meeting of creditors on the date and at the place set forth above for the purpose of being examined under oath ... The meeting may be continued or adjourned from time to time by notice at the meeting, without further written notice to creditors." *Id.* Thus, a third basis existed which required the Debtor to appear at the continued Meeting of Creditors. It strains credulity to believe that Barry, who was at this time a board certified attorney in consumer bankruptcy law, was unaware of the statute, the case law, and the Order for Relief requiring his client to attend the continued Meeting of Creditors.[24]

Apparently, Barry was so confident that Judge Greendyke would grant the Motion to Dismiss that he decided to disregard the unambiguous language of § 343, the case law, the Order for Relief, and General Order 2000–5 and instructed the Debtor not to attend the continued Meeting of Creditors. [Finding of Fact No. 30.] Unfortunately for Barry, he also seems to have forgotten—or perhaps conveniently overlooked—that merely because the Debtor voluntarily filed her Chapter 7 petition did not mean that she had an absolute right to dismiss her case. *See Sicherman v. Cohara (In re Cohara),* 324 B.R. 24, 27–28 (6th Cir. BAP 2005); *In re Stephenson,* 262 B.R. 871, 873 (Bankr. W.D.Okla.2001); *In re Ferguson,* 2006 Bankr.LEXIS 3204 *7 (Bankr.Mont. Mar. 22, 2006). Indeed, Judge Greendyke denied the Motion to Dismiss [Finding of Fact No. 58] because, among other reasons, both the Trustee and the Debtor's ex-husband lodged objections. [Findings of Fact Nos. 32, 33.] If, as Barry has contended all along, a debtor may file a Chapter 7 petition and then file a motion to dismiss and assert that no attendance at the meeting of creditors is required until the court rules on the motion to dismiss, debtors could wreak havoc upon the orderly administration of the bankruptcy system. They could file a petition in order to benefit from the imposition of the automatic stay, but then, in order to avoid examination about questionable transactions, simply file a motion to dismiss and refuse to submit to examination. Such a scenario would unquestionably eviscerate the most fundamental requirement of the bankruptcy system: namely, disclosure of the debtor's financial affairs, including pre-petition conveyances. Barry's view of the world allows debtors to use the bankruptcy system as both a sword and a shield. If his approach does not constitute bad faith tactics, then nothing does. This Court finds that Barry's strategy of filing the Motion to Dismiss as a pretext for the Debtor not attending the continued Meeting of Creditors and not producing the promised documents constitutes bad faith conduct.

■ At the Sanctions Hearing, Barry's counsel, in examining Barry, adduced testimony to the effect that the Trustee could have filed a motion to compel the Debtor

---

mate reason not to appear—for example, the death or disability of the Debtor.

**24.** It also strains credulity that Barry was unaware of the provisions concerning meetings of creditors in General Order 2000–5 of the United States Bankruptcy Court for the Southern District of Texas effective April 4, 2000. *See* Footnote No. 23.

to attend the continued Meeting of Creditors. [Docket No. 135, p. 41:23–25.] Once again, Barry's approach to the bankruptcy practice smacks of bad faith. The Court supposes that the Trustee could have filed a motion to compel the Debtor to attend the continued Meeting of Creditors. However, aside from the fact that the Debtor and her first counsel, Hawks, represented to the Trustee at the June 6, 2001 Meeting of Creditors that they would appear at the June 20, 2001 continued Meeting—apparently Barry could care less about commitments made by his predecessor counsel and his client—this Court finds Barry's approach, if accepted, to be one that would also significantly harm the orderly administration of the bankruptcy system. Section 343 expressly requires the debtor to appear and submit to examination at the meeting of creditors. Under Barry's approach, any debtor could simply choose not to attend and thereby force the trustee to spend time and money drafting, filing, and prosecuting a motion to compel the debtor to appear at the meeting of creditors. "A trustee is not required … to chase the debtors into court to gain their cooperation." *Robb v. Sowers* (*In re Sowers*), 97 B.R. 480, 487 (Bankr.N.D.Ind.1989) (court sanctioning debtors' attorney for counseling the debtors to ignore or affirmatively violate obligations imposed upon them by § 521).

Aside from the fact that such an approach could impose substantial legal fees on the trustee, the scheduling and holding of meetings of creditors would become a nightmare. Chapter 7 trustees routinely schedule meetings of creditors at 15 to 30 minute intervals for an entire day; and if debtors could simply decide not to attend, trustees might well find themselves cooling their heels for 30 minutes or an hour be-

fore being able to examine the next debtor who decides to make an appearance. Thereafter, the trustees would need to return to their office and file motions to compel those non-appearing debtors to attend their respective meetings of creditors; obtain an order so requiring; and then schedule another round of creditor meetings—plus give another notice to creditors of the rescheduled meetings—for the debtors to attend. Such a scenario would be an enormous waste of the trustee's time and resources, as well as a waste of the time and resources of those creditors who appeared at the initial meeting of creditors only to learn that the debtor had decided not to attend.

In the case at bar, the Debtor did in fact attend the initial Meeting of Creditors on June 6, 2001, together with her first attorney, Hawks. [Finding of Fact No. 16.] However, once Barry took over the representation on or about June 15, 2001—less than a week before the continued Meeting of Creditors was scheduled to be held— Barry filed the Motion to Dismiss [Finding of Fact No. 28]; and, using the Motion as a pretext, he wrote a letter to the Trustee stating that the Debtor would not be attending the continued Meeting of Creditors. [Finding of Fact No. 30] Given the Debtor's testimony that she completely relied upon the advice of her counsel—testimony which the Court believes—this Court concludes that the Trustee has shown that Barry told his client not to attend the continued Meeting of Creditors scheduled for June 20, 2001 and also not to attend the continued Meeting scheduled for August 29, 2001. Barry did so despite knowing that debtors have a duty to attend meetings of creditors. [Docket No. 135, p. 13:15–16.][25] The Court finds that

---

25. At the Sanctions Hearing, when counsel for the Trustee asked Barry whether debtors

have a duty to attend meetings of creditors,

Barry's instruction to the Debtor not to attend the continued Meeting of Creditors constitutes bad faith conduct on his part.

At the Sanctions Hearing, Barry's counsel attempted to establish a defense for Barry by posing to him the following question: "And if the debtor chooses not to cooperate with the process, such as choosing not to appear at a creditor's [sic] meeting, are the penalties on the debtor or on the debtor's counsel?" [Docket No. 135, p. 34:17–20.] Not surprisingly, Barry answered this question by stating that "Well, they're on the debtor." [Docket No. 135, p. 34:21.] The thrust of this exchange was an attempt to convince this Court that the Debtor's failure to attend the continued Meeting of Creditors on June 20, 2001 was entirely the Debtor's decision. The Court finds to the contrary. The Debtor in fact attended the initial Meeting on June 6, 2001 [Finding of Fact No. 16]; the Trustee told her to come back on June 20, 2001 [Finding of Fact No. 21]; Hawks testified that if Barry had not taken over the representation, both Debtor and he would have attended the June 20, 2001 continued Meeting of Creditors [Docket No. 131, p. 89:1–9]; the Debtor testified that she relied upon the advice of her counsel [Finding of Fact No. 30]; and Barry sent a June 18, 2001 letter to the Trustee (transmitting the Motion to Dismiss) informing the Trustee that "The Debtor will not attend that meeting." This record reflects not a unilateral decision by the Debtor not to attend the continued Meeting of Creditors, but rather a decision made by the Debtor upon advice from Barry not to attend. [Finding of Fact No. 30.] Barry's August 14, 2001 letter to the Trustee, which once

again informed him that the Debtor would not attend the second rescheduled Meeting of Creditors on August 29, 2001, also reflects advice from Barry for the Debtor not to attend. [Finding of Fact No. 39.] In sum, the record reflects, and this Court so finds, that the Debtor did not attend the continued Meeting of Creditors due to a deliberate strategy developed by Barry. The Court further finds that Barry's tactics reek of bad faith.

**b. Barry himself did not attend the continued Meeting of Creditors on June 20, 2001.**

██ "Appearance at a § 341 meeting is mandatory. It is not waivable". *Keiser,* 204 B.R. at 700 (holding that appearance by a debtor is mandatory). The same conclusion is true for the debtor's counsel. *In re Johnson,* 291 B.R. 462, 468 (Bankr. D.Minn.2003) ("The 341 meeting of creditors ... is likewise a core event in a bankruptcy case. Moreover, where in the relief from stay context it is conceivable that the *additional fees may be warranted* ... it is difficult to fathom a basic, original retainer not including counsel's attendance and representation at the 341 meeting, *in every case."*) (emphasis in original).

In the case at bar, Barry took a $2,500 retainer[26] yet still argues that he was not obligated to attend the Meeting of Creditors because there is no statutory duty requiring counsel to appear at this meeting. [Docket Nos. 25, 120, ¶ 111.] The language of General Order 2000–5, which was in effect in 2001 during the pendency of Barry's representation of the Debtor, clearly imposed a duty on debtors' attor-

---

Barry responded in the affirmative. [Docket No. 135, p. 13:15–16.]

**26.** The Court notes that, anecdotally, this retainer seems to be much higher than the prevailing norm for Chapter 7 cases in the

Southern District of Texas in 2001, when the retainer was taken in this case. This amount would even be high by the present day standards, the range of which is typically between $1,000.00–$1,500.00.

neys to appear even when their client does not:[27] "Even when the Debtor is physically or mentally unable to participate in the Creditors' Meeting, a representative of the Debtor must appear and attempt to provide the trustee with all relevant information." *See* Attach No. 1; http://www.txs.uscourts.gov/bankruptcy/rulesformsproc/341_meet_attend.pdf. The representative to which this rule refers for appearing at the meeting of creditors in the debtor's place would most logically be the debtor's counsel.[28] This Court finds it unfathomable that Barry could take a such a large retainer and yet argue that it is not part of his obligation as counsel for the Debtor to appear at the continued Meeting of Creditors. Indeed, Barry himself filed a Disclosure of Compensation Under 11 U.S.C. Sec. 329 and Bankruptcy Rule 2016(b), certifying that "the Debtor has been informed and has agreed that the compensation paid shall include the following legal services ... (c) *Attendance at 341 First Meeting.*" [Docket No. 25 (emphasis added).] Thus, Barry's own disclosure reflects that he represented to this Court that the scope of his representation included his attendance at any meeting of creditors.

 Additionally, this Court believes that, aside from any obligation owed directly by Barry to the Debtor to attend the meeting of creditors, Barry, as a counsel for a debtor, owes a professional duty to the system to appear at this meeting. This obligation is not mooted simply by the Debtor's absence from the meeting. Not only does a debtor have a duty to cooperate with the Trustee, *see* 11 U.S.C. § 521(a)(3); counsel for the debtor, as an agent of the debtor, shares this duty to cooperate with the Trustee. *Agresti v. Rosenkranz (In re United Utensils Corp.),* 141 B.R. 306, 309 (Bankr.W.D.Pa.1992); *see also In re Stinson,* 269 B.R. 172, 176–77 (Bankr.S.D.Ohio 2001). Thus, even if a debtor does not appear at a meeting of creditors, there is an obligation for the debtor's attorney to attend the meeting of creditors on behalf of the debtor.

There are good policy reasons behind this requirement. By the attorney attending the meeting of creditors without the debtor, a trustee is able to understand that the root of the problem probably lies with the debtor and not the attorney. However, when the attorney and the debtor both fail to appear, any trustee could reasonably conclude that it was under the advice and direction of the attorney that the debtor did not appear. Although both of these scenarios are troublesome, each set of circumstances alerts the trustee to different problems, and affords the trustee the opportunity to decide what action to take, including whether to retain counsel.

Given that: (1) Barry took a $2,500.00 retainer; (2) disclosed in his Rule 2016(b) Statement that the scope of his services included attendance at the meeting of creditors; and (3) had a professional obligation himself to appear at the continued Meeting of Creditors on June 20, 2001, this Court finds that Barry's failure to appear at the continued Meeting of Creditors constitutes bad faith conduct on his part.

27. *See* Footnote No. 23.

28. The Court also could envision this person being the spouse of the debtor, or perhaps a sibling or child of the debtor. In the case at bar, however, the Debtor had no spouse, as she was divorced, and her son apparently sufficiently despised her that he assuredly would not have attended in her place. [*See* Docket No. 132, p. 30:22–25.] (Since the son testified that "I wish she wasn't a part of my life anymore," the Court believes that it may reasonably conclude that her son would not have attended the meeting in place of his mother.)

### c. Barry filed the Motion to Dismiss the Debtor's case, which included materially and blatantly false factual and legal contentions, for the purpose of delaying and hindering the Trustee's further examination of the Debtor at the continued Meeting of Creditors.

Barry made blatantly false factual and legal contentions in the Motion to Dismiss that were misleading to creditors. Barry falsely claimed that: (1) "No creditor in this case would suffer any legal prejudice by its dismissal;" and (2) "The interests of the creditors and the Debtor would be better served by the dismissal of this bankruptcy proceeding rather than its continuation and adjudication." [Docket No. 7, ¶¶ 3, 4.]

With respect to creditors, nothing could have been further from the truth at the time Barry made these assertions, and he was clearly aware of their falsity. Barry knew that the Debtor had transferred property, that the Trustee was investigating such transfers, and that the Trustee was seeking documents relating to the transfers of property. [Finding of Fact No. 24.] Moreover, Barry knew, or should have known, that the Debtor's schedules showed only $18.00 in cash and total assets of $403.00 [29] [Docket No. 1, Summary of Schedules]; and if he believed these Schedules, he could not possibly have believed that it was in the best interests of creditors for the case to be dismissed, as there were simply too few assets with which to pay claims; [30] rather, the only chance for claims to be paid was for the case to remain on the docket and the Trustee to recover assets from third parties. Thus, it was undeniably in the best interests of the creditors for the Trustee to retrieve and sell the Real Properties, the transfers of which Barry was attempting to conceal, so that the proceeds from the sales could be used to pay their claims. Such a scenario was only possible if the case was not dismissed and the Trustee was allowed to take the action that he in fact was eventually able to take.

Indeed, if the case had been dismissed, the Trustee would have had to stop his investigation and move onto other cases. Under this scenario, the Debtor's conveyances of the Westlock Property and Campbellford Property would never have been uncovered and unwound; there would be no assets to pay creditors; and the Debtor and her son would still be in control of the Real Properties today. [31] This is the exact scenario that Barry wanted for his client, and to achieve this objective, he made materially false allegations in the Motion to Dismiss in the hope that creditors would rely upon and accept these representations to conclude that their interests would be best served if they did not oppose dismissal. Barry's misstatements in the Motion to Dismiss evidence a pattern of deceiving

---

29. As a board certified consumer bankruptcy attorney, when Barry took over the representation, he should have reviewed the Debtor's Schedules in order to familiarize himself with this information, which is fundamental to any bankruptcy.

30. Conversely, if Barry did not believe that the Debtor's schedules were accurate, then he would have known, or at least suspected, that the Debtor was concealing assets; and under these circumstances, no attorney mindful of his ethical duties about filing proper pleadings would represent that it was in the best interests of creditors for the case to be dismissed.

31. Aside from discovering the Debtor's conveyances of the Real Properties, the Trustee also discovered the Debtor's conveyances of monies and personal property. [Finding of Fact No. 61.] The Trustee would have been unable to make any of these discoveries if the case had been dismissed.

the Trustee, the Court, and all of the creditors in this case.

At the Sanctions Hearing, Barry testified that his job, as counsel for the Debtor, was to look out for her interests, not the interests of the creditors. [Docket No. 131, p. 13:16–20.] This Court agrees with Barry that he had a duty to look out for the Debtor's interests. This Court disagrees with the approach that he took to do so. In the wake of Barry learning about the Trustee's concern over concealed transfers, it may well have been in the *Debtor's* best interests—as opposed to the *creditors'* best interests—to obtain dismissal of the case and thereby avoid further scrutiny from the Trustee. And, if Barry had simply filed a motion to dismiss alleging, for example, that the Debtor sought dismissal because she believed it was *her* best interests or, by way of another example, because she had determined she was no longer in need of a discharge, then Barry would have been on safe ground; either of those statements would have been true and a valid basis for the Debtor to seek dismissal of her case (subject, of course, to opposition by any creditor or other party in interest). Instead, Barry alleged that dismissal would be in the best interests of creditors, and in so doing, he knowingly made patently false allegations. Indeed, he knowingly made these allegations even after Stewart, counsel for the Debtor's ex-husband, told him that her client would oppose any motion to dismiss filed by the Debtor. [Docket No. 135, p. 29:12–20.] [32] The Court finds that Barry's filing of the Motion to Dismiss and his representations therein that dismissal was in the best interests of creditors constitute bad faith conduct.

The Court is further disheartened with Barry's attempt at the Sanctions Hearing to downplay the existence and importance of creditors in this case. He testified that the Debtor's Chapter 7 case was merely a two-party dispute between the Debtor and her ex-husband [Docket No. 135, p. 11:8–18]—thereby suggesting that a dismissal really was not prejudicial to creditors because the only creditor was the ex-husband, who presumably could then have turned to the family law court which granted the divorce for any further relief that he sought against the Debtor. The problem with Barry's testimony is that, once again, he conveniently overlooks the truth. The very Schedules, both initial and amended, completed and filed by the Debtor—and Barry had access to these Schedules prior to filing the Motion to Dismiss [33]—showed that there were 10 creditors who held aggregate debt in the amount approximately $111,000.00, none of which claims the Debtor disputed. [Findings of Fact Nos. 4, 8, 13.] Moreover, both the initial Schedules and the amended Schedules reflect that the Debtor's ex-husband held $48,036.11, or 43%, of the aggregate debt, and that the other nine creditors held $62,963.89, or 57%, of the

---

32. And, true to her word, counsel for the Debtor's ex-husband, Pam Stewart, did in fact timely file a Response and Objection to Debtor's Motion to Dismiss. [Finding of Fact No. 33.]

33. The record is unclear whether Hawks or the Debtor gave Barry copies of these Schedules when Barry took over the representation. As a board certified consumer bankruptcy attorney, Barry should have requested copies. However, even if he did not or could not obtain copies from Hawks or the Debtor, he could easily have reviewed the Schedules in the Debtor's file at the courthouse. (Note: Case Management/ Electronic Case Filing (CM/ECF) was not in effect in the Southern District of Texas Bankruptcy Court until March of 2002, so Barry would have had to come to the courthouse—a practice which was not atypical prior to the introduction of CM/ECF.)

aggregate debt. [Docket Nos. 1, 5.][34] These dollar amounts and percentages underscore that the Debtor had several claimants other than her ex-husband and that the Chapter 7 was hardly a mere two-party dispute. Barry's contention that this Chapter 7 case was nothing more than a two-party dispute is further evidence of his willingness to disregard the truth in order to justify his tactics. The Court finds that Barry's use of the two-party argument to justify his filing of Motion to Dismiss and instructions to the Debtor to neither attend the continued Meeting of Creditors nor produce the promised documents constitutes bad faith conduct on Barry's part.

> **d. Barry drafted a letter to the Trustee, dated October 17, 2001, intentionally misstating the law regarding the allowable reach-back period for fraudulent transfers under the Bankruptcy Code in an attempt to mislead, deceive, and harass the Trustee.**

When Eisen, on behalf of the Trustee, attempted to obtain a mutually satisfactory date from Barry to conduct the 2004 Examination of the Debtor, Barry disregarded Eisen's letters, thereby causing her to file a 2004 Examination Notice and unilaterally schedule the Examination. [Findings of Fact Nos. 41–43; Trustee's Exhibit No. 7.] The 2004 Examination Notice included a subpoena requiring the Debtor to produce documents regarding various transactions going back to January 1, 1998 (i.e., approximately 3 ½ years prior to the filing of the Debtor's Chapter 7 petition). *Id.* At this juncture, Barry decided to respond by sending a letter dated October 17, 2001 to Eisen regarding the Trustee's document request for the 2004 Examination. [Finding of Fact No. 44; Trustee Exhibit No. 8.] In this letter, Barry stated that:

> *The Bankruptcy Code permits the Trustee to look back for up to one year with an eye toward fraudulent transfers or preferences to insiders.* As you know, the Debtor was divorced in November 2000 and that Court divided whatever property the Debtor may have owned prior to her divorce. Given the time limits permitted in the Bankruptcy Code and since the divorce decree will show transfers of property owned by the Debtor and her former spouse on the date of this entry, it would seem that only transfers made later are relevant here.
>
> If you would amend your subpoena, there would be no need for me to seek to quash the request.

[Trustee Exhibit No. 8 (emphasis added).]

 Barry's letter misstates the law to a degree that would not be expected, nor can be accepted, of a board certified attorney with his level of experience in bankruptcy. Barry knew, or should have known, that 11 U.S.C. § 544(b)(1) allows the Trustee to use the applicable Texas state law to look back *four years* to file fraudulent conveyance actions against a debtor, not the one year that Barry claimed in the letter. This is black letter law. *See* Tex. Bus. & Com. Code Ann. §§ 24.005 (Vernon 2002) (titled: Transfers Fraudulent as to Present and Future Creditors), 24.010 (Vernon 2002) (setting

---

34. These figures are based on the numbers set forth in the Debtor's initial Schedules. [Docket No. 1.] However, in the Debtor's amended Schedules, the apportionment of the debt to the Debtor's ex-husband and the remaining creditors is substantially the same.

The Debtor's amended Schedules set forth $111,556.99 in total liabilities, with her ex-husband holding $46,661.11, or 42% of the aggregate debt, and her other creditors holding $64,985.88, or 58% of the aggregate debt. [Docket No. 5.]

forth four-year statute of limitations for fraudulent transfer action brought pursuant to TEX. BUS. & COM. CODE ANN. § 24.005(a)); *Floyd v. Dunson (In re Rodriguez)*, 209 B.R. 424, 432–33 (Bankr. S.D.Tex.1997) (discussing how the four-year period of Texas law applies to bankruptcy through 11 U.S.C. § 544(b)); *see also Gandy v. Gandy (In re Gandy)*, 299 F.3d 489, 497 n. 7 (5th Cir.2002).

Barry's letter, based on a legal falsehood, is yet another example of his obstructionist tactics and attempts to prevent the Trustee from carrying out his duties. The message of Barry's letter was that the Trustee would have to amend the subpoena to avoid dealing with Barry filing a motion to quash. The clear intent on Barry's part was first, to further delay the production of any documents to the Trustee; and, second, to prevent any production of documents pertaining to transactions occurring more than one year prior to the filing of the Debtor's petition. The Court finds that these tactics constitute bad faith conduct on the part of Barry.

**e. Barry instructed the Debtor not to produce documents requested by the Trustee which prior counsel to the Debtor had already agreed to turn over.**

■ Once a Chapter 7 debtor has committed, personally or through her attorney acting as her agent, to produce documents to the Chapter 7 Trustee, she is obligated to produce those documents.[35] The Trustee was doing his job in examining the Debtor at the initial Meeting of Creditors on June 6, 2001 and asking for documents in response to her suspiciously skeletal schedules listing no income, no expenses and almost no assets. [Docket No. 1, Summary of Schedules.] Indeed, the Trustee had a duty to investigate the

Debtor's financial affairs under § 704. *In re Cortez*, 457 F.3d 448, 457 (5th Cir.2006); *see also Mele v. First Colony Life Ins.*, 127 B.R. 82, 86 (D.D.C.1991).

■ *Cortez* underlines the importance of the trustee's fiduciary duty to the estate to not sit idly by, but to actively investigate the financial affairs of the debtor in order to maximize the value of the estate. "[D]ebtors are obligated to amend their schedules to include subsequent income, even if that income is not known or realized at the time of filing. Section 521(3) requires the debtor to cooperate with the trustee, and § 1302(b) imposes duties on the trustee, including the duty to investigate the debtor's financial affairs under § 704." *Cortez*, 457 F.3d at 457. Moreover, as already noted, counsel for the debtor has a duty to cooperate. *Agresti*, 141 B.R. at 309; *see also Stinson*, 269 B.R. at 176–77.

■ Here, Barry failed miserably to cooperate with the Trustee. At the initial Meeting of Creditors on June 6, 2001, Hawks, in the Debtor's presence, committed to produce the documents for the Trustee. [Docket No. 130, p. 34:22–25; Docket No. 131, pp. 54:10–55:16; Finding of Fact No. 20.] Therefore, Barry, as substitute counsel, had a duty to honor that commitment to the Trustee; it is the equivalent of Barry having made the statements of Hawk. Indeed, at the Sanctions Hearing, Barry admitted that he had a duty to honor the commitment that Hawks had made. [Docket No. 131, p. 48:9–18.] Despite Hawks' assurances, no documents were ever turned over to the Trustee. Responsibility for the failure to produce these documents can be imputed to Barry because he advised the Debtor to take this course of inaction. [Finding of Fact No.

---

**35.** Indeed, she is obligated in any event. 11 U.S.C. §§ 521(a)(3), 727(a)(3).

40.] Barry advised the Debtor that no documents should be turned over, and that the Debtor should not attend the continued Meeting of Creditors because the Motion to Dismiss had yet to be ruled on. [Finding of Fact Nos. 30, 40.] Relying on this advice, the Debtor did not turn over the documents. The Court finds that Barry's advice to the Debtor was intended to obstruct and delay the bankruptcy process and was unacceptable from a board certified attorney with such extensive experience. The Court further finds that Barry's advice constitutes bad faith conduct.

#### f. Sanctions against Barry are also appropriate under 28 U.S.C. § 1927.

 This Court may also rely upon 28 U.S.C. § 1927 to sanction Barry's conduct in this case.[36] This section directly addresses attorneys:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiples the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927.

 The Supreme Court has cautioned that sanctions against an attorney "should not be assessed lightly or without fair notice and an opportunity for a hearing on the record." *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 767, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980). In *Chambers*, the Supreme Court addressed due process when discussing when a court could resort to its inherent powers: "A court must, of course, exercise caution in invoking its inherent power, and it must comply with the mandates of due process, both in determining that the requisite bad faith exists and in assessing fees." *Chambers*, 501 U.S. at 50, 111 S.Ct. 2123 (citing *Roadway Express*, 447 U.S. at 767, 100 S.Ct. 2455).

 Here, Barry had sufficient notice and a hearing to justify sanctions under 28 U.S.C. § 1927. Although the Trustee's Motion for Sanctions did not expressly include any reference to 28 U.S.C. § 1927, the very filing of the Motion for Sanctions put Barry on notice that this Court would be considering sanctions against him. [*See* Docket No. 78; Finding of Fact Nos. 101–105, 108.] Further, the very conduct that served as the basis of the Trustee's Motion for Sanctions against Barry is identical to the conduct the Court considers under 28 U.S.C. § 1927. Additionally, the Court held the multi-day Sanctions Hearing during which Barry had ample opportunity to defend this conduct. *See Steinert v. Winn Group, Inc.*, 440 F.3d 1214, 1222–24 (10th Cir.2006) (due process was not violated when the district court based its sanctions on 28 U.S.C. § 1927, but the Motion for

---

**36.** Although the Trustee's Motion for Sanctions does not specifically seek sanctions pursuant to 28 U.S.C. § 1927, the Fifth Circuit has long held that "the caption on a pleading does not constrain the court's treatment of a pleading." *North Alamo Water Supply Corp. v. City of San Juan*, 90 F.3d 910, 918 (5th Cir.1996). The Fifth Circuit has often recognized that "[t]he relief sought, that to be granted, or within the power of the Court to grant, should be determined by substance, not a label." *Edwards v. City of Houston*, 78 F.3d 983, 995 (5th Cir.1996) (quoting *Bros. Inc. v. W.E. Grace Mfg. Co.*, 320 F.2d 594, 606 (5th Cir.1963)). Additionally, Federal Rule of Civil Procedure 8(f), which applies to bankruptcy cases through Bankruptcy Rule 7008, provides: "All pleadings shall be so construed as to do substantial justice." Accordingly, because this Court finds that Barry has "so multiple[d] the proceedings in this case unreasonably and vexatiously," this Court will grant relief pursuant to 28 U.S.C. § 1927.

Award of Attorney's Fees never mentioned 28 U.S.C. § 1927). In sum, due process requirements have more than been satisfied under these circumstances. *Woods v. Fed. Home Loan Bank Bd.*, 826 F.2d 1400, 1410 (5th Cir.1987) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 482, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972)) ("Procedural due process is a flexible concept and 'calls for such procedural protections as the situation demands.' "); *see also Travelers Ins. v. St. Jude Hosp.*, 38 F.3d 1414, 1416–17 (5th Cir.1994).

In order to impose sanctions against Barry, by the plain language of 28 U.S.C. § 1927, this Court must find that: (1) Barry's conduct multiplied the proceedings; and (2) that the conduct was both unreasonable and vexatious. *Travelers Ins.*, 38 F.3d at 1416–17 (citing *FDIC v. Conner*, 20 F.3d 1376, 1384 (5th Cir.1994)). First, this Court has already found that this conduct multiplied the proceedings. Barry filed the Motion to Dismiss, which caused the Trustee to have to file a response and spend time and money defeating this motion. Further, if Barry had complied with the Trustee's original request to produce documents and instructed the Debtor to attend the continued Meeting of Creditors back in 2001, the Trustee would not have had to spend the time and money tracking down the information about the status of the Real Properties. [Finding of Fact Nos. 30, 40, 60, 61.] It is conceivable that if Barry followed his duties and the Trustee had uncovered the complete factual picture back then, the substantial destruction of the Real Properties could have been prevented since that conduct did not occur until several years later. [*See* Finding of Fact Nos. 93–99.]

■ Second, the Fifth Circuit has interpreted the unreasonable and vexatious requirement to mean "evidence of recklessness, bad faith or improper motive must be present." *Travelers Ins.*, 38 F.3d at 1417 (citing *Hogue v. Royse City, Tex.*, 939 F.2d 1249, 1256 (5th Cir.1991)). The Court finds that Barry's conduct in this case constituted bad faith and was done with an improper motive. The motive behind Barry's conduct was to prevent the Trustee from further examining the Debtor and from receiving documents or other information from the Debtor that would have revealed the full extent of her interest in the Real Properties. [*See* Findings of Fact Nos. 30, 40, 61.] The Motion to Dismiss was based on false statements of law and fact, and Barry used that Motion as a false pretense to justify the Debtor's refusal to cooperate with the Trustee. [*See* Findings of Fact Nos. 28–31, 34, 38–40.] At a minimum, the conduct described in this Memorandum Opinion meets the standard of improper motive, and virtually all of Barry's conduct reached the level of bad faith. Therefore, this Court also finds that sanctions against Barry are justifiable not only under this Court's inherent powers pursuant to § 105, but also under 28 U.S.C. § 1927.

■ The Fifth Circuit has held that a movant who seeks to recover the entire amount of his attorney's fees and costs under 28 U.S.C. § 1927 must prove, by clear and convincing evidence, that all of the conduct of the respondent attorney was patently meritless and that this attorney wrongfully persisted in this conduct. *Procter & Gamble Co. v. Amway Corp.*, 280 F.3d 519, 526 (5th Cir.2002); *Mitchell v. Metro. Life Ins. Co.*, 73 Fed.Appx. 79 (5th Cir.2003) (unpublished opinion). This Court construes these holdings to mean that if the movant seeks to recover less than the entire amount of his attorney's fees and costs, then the burden of proof is by a preponderance of the evidence. In the case at bar, the Trustee does not seek to recover all of its fees and expenses.

For example, Susan Brandt is an attorney who, in addition to Eisen, represented the Trustee at the Sanctions Hearing. Her hourly rate is $365.00 [Docket No. 85], and the Trustee expressly represented to the Court that he was not seeking to recover Brandt's fees from Barry for the time that Brandt spent helping in the prosecution of the Motion for Sanctions. [Docket No. 130, pp. 56:3–7, 57:6–13.] Moreover, this Court is not awarding all of Eisen's fees. Accordingly, the Court concludes that here, the Trustee's burden of proof is by a preponderance of the evidence, and the Court finds that the Trustee has met his burden. Alternatively, if this Court is incorrect in its interpretation of the Fifth Circuit's holding in *Procter & Gamble,* and the Trustee's burden is by clear and convincing evidence, then this Court nevertheless finds that the Trustee has met his burden.

### 6. Prior case law on all fours supports imposing sanctions against Barry for his conduct.

In *Sowers,* a Chapter 7 trustee filed a motion for sanctions against the debtors and their counsel for pursuing a strategy designed to impede her carrying out her duties as a trustee. *Sowers,* 97 B.R. at 482–84. Specifically, the trustee contacted the debtors' bank to request that certain funds be delivered to her in her capacity as trustee. *Id.* at 482 Counsel for the debtors contacted the bank and instructed it not to comply with the requests. *Id.* When the trustee contacted this counsel to obtain an explanation, he conceded that the monies at the bank were property of the bankruptcy estate but argued that the trustee had to file a complaint for turnover in order to retrieve the funds. *Id.* at 483. The trustee responded by reminding counsel of the obligation under § 542 to turn over property of the estate to the trustee, and she informed counsel that unless he

advised the bank to release the funds, she would proceed to file a complaint and seek to recover attorney's fees for having to take this action. *Id.* Counsel for the debtors refused to change his instructions to the bank. Accordingly, the Trustee filed a complaint for turnover. Counsel for the Debtor then filed an answer which, contrary to what he told the trustee when first speaking to her, denied that the funds were property of the estate, thereby forcing the trustee to spend time and money filing a motion for summary judgment with supporting affidavits and a memorandum of law. *Id.* Counsel for the debtors failed to file a response to the motion for summary judgment, and the court entered judgment for the trustee. *Id.* Thereafter, the trustee filed a motion for sanctions pursuant to Bankruptcy Rule 9011 and 28 U.S.C. § 1927. *Id.*

In granting the motion as to debtors' counsel, the *Sowers* court made several comments about the debtors' counsel which are equally applicable to Barry in the case at bar. First, in evaluating the conduct of the debtors versus the conduct of their counsel, the court made the following observation:

> Based upon the evidence presented at the hearing of the 19th, in addition to the facts as set forth above, it appears that debtors' position with regard to the question of turnover was based entirely upon the advice Mrs. Sowers received from her counsel. Without any knowledge of the intricacies of bankruptcy law, Mrs. Sowers relied entirely upon her attorney's advice in determining the proper course of action to take vis-a-via [sic] the Trustee.

*Id.* at 483–84.

In the case at bar, the Debtor, just like Mrs. Sowers, had no knowledge of the intricacies of the bankruptcy law regarding

the need to attend all meetings of creditors. [Finding of Fact No. 30.] Nor did the Debtor have knowledge of the law regarding the need to produce documents. [Finding of Fact No. 40.] The Debtor, just like Mrs. Sowers, relied upon her attorney—i.e. Barry—in not attending the continued Meeting of Creditors and in not producing documents that Hawks and she had already agreed to produce. [Findings of Fact Nos. 30, 40.]

Aside from examining the conduct of the debtors versus the conduct of their counsel, the court in *Sowers* also made certain observations about the burdens and duties that come into play when a Chapter 7 petition is filed:

> A petition for relief under Chapter 7 of the Bankruptcy Code not only confers benefits upon a debtor but also imposes burdens. The most obvious benefit, of course, is the bankruptcy discharge. The burdens are the debtor's duties, which must be fulfilled as a prerequisite to the discharge. In part, these duties are found at § 521 of the Bankruptcy Code. Among the various obligations imposed upon a debtor is the duty to "cooperate with the trustee as necessary to enable the trustee to perform the trustee's duties." 11 U.S.C. § 521(3). The trustee's duties include the obligation to "collect and reduce to money the property of the estate for which such trustee serves ...." 11 U.S.C. § 704(1). Consequently, the Bankruptcy Code also imposes a duty upon debtors to "surrender to the trustee all property of the estate ...." 11 U.S.C. § 521(4).
>
> It should be emphasized that the relationship between a trustee and a debtor is not supposed to be adversarial. The duties imposed by § 521 are affirmative obligations. A trustee is not required to play detective or to chase the debtors into court to gain their cooperation. *In*

*re Kent*, 92 B.R. 540, 543 (Bankr. S.D.Fla.1988); *In re Bianco*, 5 B.R. 466, 468 (Bankr.D.Mass.1980). Indeed, the concept of cooperation with and surrender to the trustee connote the need for willing assistance. Because "a debtor's cooperation is essential, [it is] a prerequisite to a granting of discharge." *In re McDonald*, 25 B.R. 186, 189 (Bankr. N.D.Ohio 1982).

> In this instance, because of counsel's attitude, he transformed what should have been an amicable and cooperation [sic] relationship into an adversarial one. Rather than assisting his clients in fulfilling their duties under the Bankruptcy Code, he counseled them to either ignore or affirmatively violate those obligations, in spite of what he knew to be the facts and the law. As a result, the Trustee's administration of the bankruptcy estate and fulfillment of her obligations under the Bankruptcy Code has needlessly become more time consuming, difficult, and expensive than it should have been. Under these circumstances, there can be no conclusion but that counsel has unreasonably and vexatiously multiplied these proceedings.

*Id.* at 486–87.

The *Sowers* court's observations about the debtors' counsel in that case are equally, if not more, applicable to Barry in the case at bar. By filing the Motion to Dismiss [Finding of Fact Nos. 26, 28] and counseling the Debtor not to appear at the continued Meeting of Creditors [Finding of Fact No. 30] and not to produce the documents that Hawks and the Debtor had already promised to produce [Finding of Fact No. 40], Barry transformed into an adversarial relationship what should have been—and indeed, when Hawks was representing the Debtor, what initially was—an amicable and cooperative relationship. Rather than assisting the Debtor in fulfill-

ing her duties under the Bankruptcy Code, Barry counseled her to either ignore or affirmatively violate those obligations, in spite of what he knew to be the facts and the law. Factually, he knew that the Debtor and Hawks had already promised to produce documents, and he knew that legally she had an obligation to do so. [Finding of Fact No. 40.][37] Yet, Barry counseled her not to produce them. Factually, he knew that the Trustee was concerned about possible undisclosed transfers [Finding of Fact No. 24], and he knew that legally the Trustee had the obligation and the right to examine the Debtor about this subject at the continued Meeting of Creditors. Yet, Barry counseled her not to attend the meeting. [Finding of Fact No. 30.] Factually, Barry knew that the Debtor had made pre-petition transfers, that the Debtor's schedules showed total assets to be in the very meager and questionable amount of $403.00, and that the attorney for the Debtor's ex-husband would oppose any attempt by the Debtor to dismiss her case. Yet, Barry filed the Motion to Dismiss alleging that it was in the best interests of the creditors for the case to be dismissed and then told the Trustee, without any legal basis in support of his position, that the filing of the Motion to Dismiss barred the Trustee from further examining the Debtor at the continued Meeting of Creditors and that this meeting would go forward only "[i]n the unlikely event that the case is not dismissed ...." [Trustee's Exhibit No. 4.] Factually, Barry knew that the Trustee's counsel had requested documents regarding transactions going back approximately three and a half years to January 1, 1998. Yet, Barry told the Trustee that she could only obtain documents going back one year, a position that is so contrary to black letter law that it constitutes clear and convincing evidence of Barry's bad faith.

In *Sowers,* after the court described the improper conduct and established that it was the debtors' counsel, not the debtors, whose conduct was out of line, the court then commented on the brazenness of the debtors' counsel. The court's comments apply with equal force to Barry's conduct in the case at bar:

> The court considers counsel's misconduct to be very serious indeed. This seriousness goes beyond the fact that he counseled his clients to ignore or violate their duties as debtors under the Bankruptcy Code. When the Trustee attempted to perform her duties in an efficient, expeditious, and economical fashion, counsel literally adopted a "so sue me" attitude, in spite of his knowledge of the Trustee's absolute entitlement to the asset. This attitude was based on counsel's apparent hope that if he could make turnover difficult, unpleasant, time consuming, and expensive enough for the Trustee, in view of the amounts involved, the Trustee might decide not to pursue the issue and his clients would be able to retain an asset to which they had no right. This reflects his desire to use litigation as a predatory instrument instead of a method for resolving legitimate disputes. It is an attitude which has no place in litigation generally or in the bankruptcy courts and must be condemned. Such an attitude is unworthy of a bankruptcy practitioner or an officer of the court.

*Sowers,* 97 B.R. at 489.

In the case at bar, Barry, just like the debtors' counsel in *Sowers,* counseled his client to ignore or violate her duties under the Bankruptcy Code. He told the Debtor not to appear at the continued Meeting of

---

**37.** Indeed, at the Sanctions Hearing, Barry conceded that he himself had a duty to honor the commitment that Hawks had made. [Docket No. 131, p. 48:9–18.]

Creditors and not to produce documents. He also filed a Motion to Dismiss with blatantly incorrect allegations that dismissal would be in the best interests of the creditors, and then told the Trustee that his client did not have to submit to further examination until Judge Greendyke ruled on the Motion to Dismiss. Indeed, at the Sanctions Hearing, Barry's attitude was that if the Trustee wanted to further examine the Debtor, he could have filed a motion to compel the Debtor to attend the continued Meeting of Creditors. [Docket Nos. 135, p. 41:23–25; 132, pp. 100:5–102:15.] This is exactly the "so sue me" attitude described by the court in *Sowers*. Barry's attitude was based on his apparent hope that if he could make it difficult, unpleasant, time consuming, and expensive enough for the Trustee, then the Trustee would decide not to pursue further examination of the Debtor and perhaps back off in his opposition to the Motion to Dismiss. When this approach failed, and the Trustee sought to take the 2004 Examination of the Debtor, Barry's next unsavory tactic was to threaten to file a motion to quash the subpoena contained in the 2004 Examination Notice on the grounds that the subpoena requested documents concerning events that took place more than one year prior to the filing of the Debtor's bankruptcy petition. [Finding of Fact No. 44.] This threat, which Barry made when the law clearly allows the Trustee to look back four years, reflects Barry's willingness to use litigation as a predatory instrument instead of a method for resolving legitimate disputes.

This Court strongly agrees with the court in *Sowers* when it says that such an attitude "has no place in litigation generally or in the bankruptcy courts and must be condemned. Such an attitude is unworthy of a bankruptcy practitioner or an officer of the court." *Sowers*, 97 B.R. at 489. Indeed, it is no small irony that Hawks,

the less experienced, non-board certified attorney who brought Barry, the more experienced board certified attorney into the case, conducted himself in a manner worthy of an honest and reputable debtor's attorney and officer of the court. Hawks brought his client to the initial Meeting of Creditors and, after listening to the Trustee's request for documents, agreed to produce them within 10 days. In contrast, Barry did nothing but stonewall the Trustee in every way possible using bad faith tactics.

The Court in *Sowers* noted that "Among the obligations counsel assumes by representing a bankruptcy debtor is that of assisting the client to fulfill the duties imposed upon it by the Bankruptcy Code." *Id.* at 488. This Court finds that Barry deliberately violated these obligations. This Court further finds that Barry's conduct was in bad faith. His conduct merits the imposition of sanctions against him.

### 7. What is the correct form of sanctions that this Court should impose against Barry?

■ Having determined that Barry's actions and omissions warrant the imposition of sanctions, the Court next considers what should be the correct form of sanctions against Barry. When a court uses its inherent powers under *Chambers*, it "should not ignore a material factor deserving significant weight, should consider all proper factors, and should avoid serious mistakes in weighing those factors." *Phinney v. Paulshock*, 181 F.R.D. 185, 197 (D.N.H.1998) (citing *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1117–18 (1st Cir. 1989)).

■ First, this Court finds that Barry's conduct was willful. His failure to attend the continued Meeting of Creditors was clearly deliberate in light of the fact

that he told the Debtor that her attendance was also not necessary because he had filed the Motion to Dismiss. [*See* Findings of Fact 30, 34.] Additionally, Barry's letter to Eisen demanding that she limit the scope of her examination to one year pre-petition, instead of the four years to which she was entitled, was an intentional misstatement of the law made by Barry. [Trustee Exhibit No. 8; Finding of Fact No. 44.] It is incredulous that a board certified lawyer of Barry's experience and expertise would make such a glaring mistake in drafting this letter. This Court finds that Barry sent this letter knowing that its contents were legally incorrect and misleading. Moreover, the Motion to Dismiss makes two materially false allegations. Barry claimed that: (1) "No creditor in this case would suffer any legal prejudice by its dismissal;" and (2) "The interests of the creditors and the Debtor would be better served by the dismissal of this bankruptcy proceeding rather than its continuation and adjudication." [Docket No. 7.] These assertions were so obviously false that Barry could only have made them knowingly, and this Court accordingly concludes that these misrepresentations by Barry were intentional and not negligent.

Second, this Court finds that Barry's improper conduct was part of a pattern and not an isolated event. As stated previously, Barry: (1) filed the misleading Motion to Dismiss; (2) counseled the Debtor not to attend the continued Meeting of Creditors; (3) failed himself to attend the continued Meeting of Creditors; (4) sent the letter to Eisen threatening to file a motion to quash based on a legally incorrect look-back period under the Code;

and (5) counseled the Debtor not to produce the documents that Hawks and she had already agreed to turn over. All of Barry's actions in this case show a pattern of stonewalling.

Third, there are at least two examples where Barry engaged in similar conduct in other bankruptcy cases.[38] [Finding of Fact Nos. 115, 116, 123.] In *Thomas,* Bankruptcy Judge Steen made this conclusion about Barry:

> Because counsel has prepared, signed, and filed a false petition, an improper chapter 13 plan summary and chapter 13 plan, an objection to claim and related memoranda without factual or legal basis, and a proof of claim and had advocated all of those for improper purpose, and knowing that they were factually incorrect, the Court concludes that Counsel has violated FRBP 9011(b).

*Thomas,* 337 B.R. at 895.

Barry's actions in *Thomas* were designed to thwart the Chapter 13 Trustee in carrying out his duties, just as in the present case Barry's conduct was designed to obstruct the Chapter 7 Trustee in carrying out his duties. On appeal, District Judge Hoyt reiterated Bankruptcy Judge Steen's condemnation of Barry's actions: "It is evident from the record that Barry intentionally defrauded the Bankruptcy Court. This Court [the district court] in its reviewing capacity, finds substantial evidence that Barry intentionally prepared and filed false statements to deceive the Court and the Chapter 13 Trustee." *In re Thomas,* 2006 U.S. District LEXIS 70339 *11 (S.D.Tex. Aug. 15, 2006). [Finding of Fact No. 121.]

---

**38.** In determining whether Barry should be sanctioned in this case, this Court did *not* rely upon or consider the Findings of Fact regarding previous sanctions imposed against Barry by Bankruptcy Judge Steen, later affirmed by District Judge Hoyt, and by Bankruptcy Judge Isgur. The Court draws upon these Findings only for the purpose of determining what are the correct form of sanctions.

Additionally, Bankruptcy Judge Isgur, in two unpublished opinions, has sanctioned Barry for similar behavior. [*In re Anderson,* Case No. 05–95207, Docket No. 57; *In re Deblaw,* Case No.06–30779, Docket No. 57; Finding of Fact No. 123.] In these cases, Barry took the form plan used for Chapter 13 debtors, which is required by the Local Rules, and made significant alterations to it without giving notice to the Court or the Trustee. [Finding of Fact No. 123.] Bankruptcy Judge Isgur found that: "The plan summary in the present cases contained no reference to counsel's changes to the Uniform Plan. To substantively change a plan, that is uniform by definition, makes reliance on a uniform plan summary misleading and even irresponsible. Counsel cannot have believed such a situation was allowable under the local rules." [*In re Anderson,* Case No. 05–95207, Docket No. 57; *In re Deblaw,* Case No. 06–30779, Docket No. 57.] As in the instant case, Barry's conduct in *Anderson* and *Deblaw* was intentional and designed to interfere with the Chapter 13 Trustee carrying out his duties. This Court therefore finds that Barry has exhibited a pattern of conduct intended to frustrate and deter bankruptcy trustees from carrying out their duties.

Fourth, there can be no question that Barry was trained in the law. As this Court has already pointed out, in 2001, Barry was a board certified specialist in bankruptcy with approximately fifteen years of experience. [Docket No 135, p. 6:8–15; Docket No. 131, pp. 55:19–25–56:4

and 17–20; Finding of Fact 23.] Under these circumstances, Barry must be held to a higher standard of conduct than a non-certified attorney such as Hawks.

Fifth, the Court considers what amount, given the financial resources of the responsible person, is needed to deter that person from repetition in the same case. As a result of Barry's ethics violations in *Thomas,* Bankruptcy Judge Steen ordered him to seek private tutoring from a legal ethics professor. *Thomas,* 337 B.R. at 895. This educational approach to reprimand Barry must have had no impact on his ethical judgment because thereafter Barry was sanctioned by Bankruptcy Judge Isgur.[39] Given these circumstances, this Court believes that the only way to effectively send a message to Barry is through monetary sanctions. In order to effectively deter Barry, this Court considers his individual circumstances to determine what amount of sanctions are appropriate. Barry is a seasoned attorney who charges a large retainer, $2,500.00 in this case, for example. Moreover, Barry bills himself out at a rate of $300.00 per hour for services rendered in consumer bankruptcies. This is the highest rate charged by any consumer attorney in the Southern District of Texas.[40] Therefore, a substantial financial sanction against Barry is justified so that he will be deterred from repeating such conduct.

Sixth, the Court considers what amount is needed to deter similar activity by other

---

39. On February 13, 2006, Bankruptcy Judge Steen ordered Barry to attend not less than 10 hours of ethics tutoring. [Case No. 03–43814, Docket No. 119.] Bankruptcy Judge Isgur imposed sanctions against Barry in *Anderson* and *Deblaw* on April 25, 2006. [Case Nos. 05–95207 and 06–30779, April 25, 2006 Hrg. on Show Cause Order.]

40. This Court, from time to time, receives fee applications from Barry, and his hourly rate is $300.00. True and correct copies of some of the fee applications filed by Barry in this Court are attached as Attachment No. 3. This Court routinely reviews and approves fee applications filed by numerous consumer bankruptcy attorneys, and most of them bill at hourly rates ranging from $150.00 per hour to $250.00 per hour.

litigants. This Court has unfortunately had more than a few cases where debtors have failed to disclose assets because, among other reasons, the attorneys for these debtors have not been fulfilling their duties to assist their clients. Specifically, some debtors' attorneys have failed to sufficiently impress upon their clients the need to disclose every asset that they own.[41] There are numerous recent examples where trustees have sought to reopen cases after the debtors, primarily due to nonchalant counseling, failed to disclose that they were a party to a lawsuit with a large sum of money potentially at stake. [*In re Jozwiak*, Case No. 03–33872, Docket No. 7; *In re Owens*, Case No. 03–33078, Docket No. 18; *In re Holley*, Case No. 03–39946, Docket No. 38 (Motions to reopen were filed because the debtors failed to schedule their claim in a fen-phen class action suit).] *See also In re Walker*, 323 B.R. 188 (Bankr.S.D.Tex.2005); *In re Drake*, Case No. 01–42937 (Bankr. S.D.Tex.). The debtors' bar must hear this message clearly: emphasize to clients that they must disclose all of their assets and pre-petition transactions, and when a Chapter 7 or 13 Trustee asks for documents relating to the assets and liabilities of the debtor, they must be produced as soon as possible. Therefore, the sanctions against Barry must be steep in order to send a message not just to him, but to deter other attorneys from the same kind of improper conduct.

One of Barry's defenses is that Bankruptcy Judge Greendyke permitting him to withdraw from representing the Debtor on January 21, 2002 constitutes res judicata against presently issuing sanctions. Barry's argument is that in the Trustee's Objection to the Motion to Withdraw, the Trustee asked the Court to order Barry "to pay the Trustee's fees and costs incurred to the date of his withdrawal and for such other and further relief to which Trustee may be entitled" [Docket No. 34], and because the Court did not do so then, it is precluded from doing so now. This argument lacks any integrity because the order signed by Judge Greendyke allowing Barry to withdraw included a handwritten addition from Judge Greendyke stating that "[t]his order is without prejudice to any claims, ethical or otherwise, held by the Chapter 7 Trustee." [Docket No. 37.] This express reservation shows that Judge Greendyke had contemplated the potential need for a motion for sanctions and wanted to make it abundantly clear that granting Barry's motion to withdraw would have no bearing upon the Trustee's right to subsequently bring a motion for sanctions against him in the future.

Given the circumstances described above, sanctions should be imposed against Barry. First, this Court orders that Barry pay to the Chapter 7 Estate the $2,500.00 retainer that the Debtor gave to him.

Second, the Court further sanctions Barry by requiring him to pay to the Trustee a portion of the fees and expenses for which the Trustee—or, more precisely, the Chapter 7 estate—is liable to Eisen for services rendered relating to the Trustee's opposition to the Motion to Dismiss and the Trustee's prosecution of the Motion for Sanctions. With regard to calculation of fees, the Fifth Circuit has observed that it uses the lodestar method to calculate "reasonable" attorney's fees under 11 U.S.C.

---

**41.** The Court wishes to emphasize that not every member of the debtors' bar has exhibited this lax attitude toward questioning his or her clients. There are many excellent and diligent debtors' counsel in the Houston area.

However, some attorneys have not been taking the time and care necessary to focus their clients on the need to accurately disclose all of their assets.

§ 330, which allows compensation of a trustee's attorney such as Eisen. 11 U.S.C. § 330; *In re Cahill,* 428 F.3d 536, 539–40 (5th Cir.2005) (citation omitted). The Fifth Circuit has stated that:

A court computes the lodestar by multiplying the number of hours an attorney would reasonably spend for the same type of work by the prevailing hourly rate for the community. A court may then adjust the lodestar up or down based on the factors contained in § 330 and its consideration of the twelve factors listed in *Johnson [v. Ga. Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir.1974)].

*Id.* at 540 (additional citations omitted).

11 U.S.C. § 330(a)(3) provides:

(3) In determining the amount of reasonable compensation to be awarded to an examiner, trustee under chapter 11, or professional person, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including—

(A) the time spent on such services;

(B) the rates charged for such services;

(C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

(E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

(F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

The *Johnson* factors are as follows:

(1) the time and labor required;

(2) the novelty and difficulty of the questions;

(3) the skill requisite to perform the legal service properly;

(4) the preclusion of other employment by the attorney due to acceptance of the case;

(5) the customary fee;

(6) whether the fee is fixed or contingent;

(7) time limitations imposed by the client or the circumstances;

(8) the amount involved and the results obtained;

(9) the experience, reputation and ability of the attorneys;

(10) the "undesirability" of the case;

(11) the nature and length of the professional relationship with the client; and

(12) awards in similar cases.

*Cahill,* 428 F.3d at 540 (citing *Johnson,* 488 F.2d at 719).

Applying these factors to the case at bar, the Court finds that Eisen's fees fit within the lodestar for the "number of hours an attorney would reasonably spend for the same type of work by the prevailing hourly rate for the community." *See Cahill,* 428 F.3d at 540.[42] Eisen's hourly rate of $250.00 for her services and $75.00 for the services of her staff, such as research and document preparation, are reasonable given Eisen's experience and the customary compensation charged by comparably skilled practitioners in the Hous-

---

**42.** True and correct copies of Eisen's invoices [Trustee's Exhibits Nos. 25 and 26A] are attached to this Memorandum Opinion as Attachment No. 2.

ton area. *See* 11 U.S.C. § 330(a)(3). Eisen has been practicing law since May of 1986 [Docket No. 130, p. 72:17–18], and her hourly rate is reasonable and fair given her experience. Indeed, Barry's hourly rate is $300.00 per hour,[43] so it would be difficult for him to argue that Eisen's rate is unreasonable, particularly because both of them have been practicing law for approximately the same period of time. [*See* Finding of Fact No. 23.] The Court further finds that certain of Eisen's fees were reasonable and "necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of" the case at bar. *See* 11 U.S.C. § 330(a)(3)(c).

Specifically, the Court will sanction Barry for fees that the Trustee incurred in relation to: (1) the Debtor's Motion to Dismiss; (2) the Debtor's and Barry's refusal to appear at the continued Meeting of Creditors; (3) the failure to produce the requested documents; (4) the Trustee's obtaining of documents that he is required to obtain, but could not from the Debtor (upon Barry's advice), in carrying out his duties; and (5) the Trustee's Motion for Sanctions. The Court has not included in these sanctions those fees related to Barry's Motion to Withdraw; nor is the Court awarding fees related to Eisen's research concerning Bankruptcy Rule 9011 because the Court is not affording relief with respect to this particular Rule.

Accordingly, this Court sanctions Barry $6,901.25 in fees and $704.47 in costs with respect to work the Trustee performed relating to: (1) the Debtor's Motion to Dismiss; (2) the Debtor's and Barry's refusal to appear at the continued Meeting of Creditors; (3) the failure to produce the promised documents; and (4) the obtaining of documents that the Trustee is required to obtain in carrying out his duties. The Court calculated this figure by adding the fee entries set forth in Trustee's Exhibit No. 25, which the Trustee refers to as the History Bill for Court on Attorneys [sic] and Costs Associated with the Motion to Dismiss in the Second Amended Trustee Ronald Sommers' Exhibit List for Motion for Sanctions [Docket No. 102]. In this calculation, the Court did not include the fee entries relating to Barry's Motion to Withdraw.[44]

Additionally, this Court sanctions Barry $13,951.25 in fees and $1,064.92 in costs for work that the Trustee's attorney performed related to the prosecution of the Trustee's Motion for Sanctions. The Court calculated these figures by adding the fees and costs set forth in Trustee's Exhibit No. 26A, which the Trustee refers to as History Bill for Court on Attorneys [sic] Fees and Costs Associated with Motion for Sanctions. [Docket No. 102.] The Court did not include the fee entries related to "research" because Eisen researched sanctions under Bankruptcy Rule 9011;

---

**43.** As noted in Footnote No. 40, this Court, from time to time, receives fee applications from Barry, and his hourly rate is $300.00.

**44.** Specifically, the Court did not include the following fee entries set forth in Trustee's Exhibit No. 25:

| | | | Hours | Amount |
|---|---|---|---|---|
| 12/12/2001 | MSE | Draft Objection to motion to withdraw | 1.10 | 275.00 |
| | CBB | Preparation of pleadings | 0.20 | 15.00 |
| 12/16/2001 | MSE | Draft objection to Barry's motiuon [sic] to withdraw of counsel; review same | 1.25 | 312.50 |
| 12/17/2001 | MSE | Finalize objection to motion to withdraw | 0.10 | 25.00 |
| | CBB | Preparation of Pleadings | 0.30 | 22.50 |
| 1/25/2002 | MSE | Review order allowing attorney to withdraw | 0.10 | 25.00 |
| 1/29/2002 | MSE | Docket dates; review hearing notice from debtors counsel | 0.15 | 37.50 |

and, as set forth above in section IV(B)(1), the Court finds that Barry should be sanctioned pursuant to §§ 105 and 1927, not Rule 9011.[45]

In sum, this Court imposes sanctions against Barry in the aggregate amount of $25,121.89, representing the sum of: (1) the $2,500.00 retainer which Barry took from the Debtor; (2) the reasonable and necessary attorney fees of $6,901.25 for the Trustee's efforts in defeating the Motion to Dismiss; (3) the reasonable and necessary costs of $704.47 incurred in defeating the Motion to Dismiss; (4) the reasonable and necessary attorney fees of $13,951.25 for the prosecution of the Motion for Sanctions; and (5) the reasonable and necessary costs of $1,064.92 incurred in prosecuting the Motion for Sanctions. Barry must immediately remit a cashier's check in the amount of $25,121.89 made payable to Ronald Sommers, Chapter 7 Trustee.

## B. Show Cause Order Against the Debtor and Chad Cochener

This Court finds that the Debtor violated her duties under the Code by failing to attend the continued Meeting of Creditors and for not cooperating with the Trustee in the production of certain documents. The Debtor presented two defenses as to why she should not be sanctioned for these actions.

First, the Debtor was under a great deal of stress from several traumatic life events. She had just finished a rather intense divorce [Finding of Fact No. 8, Footnote No. 4] and was living with a harsh, uncaring son. [Docket No. 132, pp. 30:22–31:7.] Indeed, Chad Cochener testified under oath that he wished that he did not have to take care of his mother.[46] The Court takes note of the Debtor's situation and sympathizes with her hardship. However, this is not an acceptable excuse to completely ignore her duties as a debtor. Second, the Debtor claimed that she was following the advice of counsel and that she did not have an understanding of what was happening in her case. This Court has no doubt that the Debtor was relying upon the advice of her counsel, Barry, who told her not to appear at the continued Meeting of Creditors and not to produce

**45.** Specifically, the Court did not include the following fee entries set forth in Trustee's Exhibit No. 26A:

| | | | Hours | Amount |
|---|---|---|---|---|
| 3/16/2005 | DC | Research issues involved in sanctions motions; Begin drafting motion | 1.25 | 93.75 |
| 3/17/2006 | DC | Being [sic] research and drafting motion for sanctions | 2.15 | 161.25 |
| 5/12/2006 | DC | Research previous notice of sanctions in motion to withdraw | 0.20 | 15.00 |
| 5/13/2006 | DC | Research sanctions issues in preparation for motion and possible hearing | 1.30 | 97.50 |
| 5/15/2006 | DC | Research issues under 9011 raised by Barry | 0.75 | 56.25 |
| 6/1/2006 | DC | Research issues under Rule 11 and bankruptcy sanctions motion | 1.15 | 86.25 |
| 8/10/2006 | DC | Research for hearing | 0.50 | 37.50 |
| 8/21/2006 | DC | Research for hearing | 1.25 | 93.75 |
| 8/22/2006 | DC | Research for hearing | 1.45 | 108.75 |
| 8/28/2006 | MSE | Research issues for hearing | 2.90 | 725.00 |
| 8/29/2006 | DC | Research further issues for trial | 2.15 | 161.25 |

**46.** Upon direct examination by Eisen, Chad Cochener stated, "I've been supporting my mother out of my moral obligation for conceiving me and making me. I don't like supporting my mother in any way, shape or form.

the documents which Hawks had promised would be produced. However, the Debtor is not able to hide behind her first counsel, Hawks, who was representing her when she completed her initial and amended Schedules and Statement of Financial Affairs. The Debtor has a duty to read and understand the contents of documents before signing them under oath and penalty of perjury. Hawks did not counsel her to submit false Schedules and an inaccurate Statement of Financial Affairs, which she clearly did. [Finding of Fact Nos. 15, 60.] Further, she failed to attend the 2004 Examination, which the Trustee scheduled, and repeatedly rescheduled, in the fall of 2001. [Finding of Fact Nos. 41–43, 48.]

Therefore, the Court finds that sanctions are appropriate against the Debtor for (a) her abuse of the bankruptcy process, (b) defrauding the Court by filing false Schedules and Statement of Financial Affairs, and (c) refusing to appear at the properly scheduled 2004 Examination. For these violations, this Court orders a sanction against the Debtor of $1,000.00.

 Moreover, the Debtor, along with her son, deserve to be sanctioned for the near destruction of the Real Properties. This Court finds that Chad Cochener and the Debtor were responsible for the extremely dilapidated condition in which they left the Real Properties. Alternatively, if they were not the direct cause of the disrepair, they are still liable because they were responsible for the upkeep of the house. The Debtor and Chad Cochener attempted to blame the condition of the house on the fact that the "day laborers" they hired had left the house unlocked, with the implication that some third party entered the house, pilfered, and defiled it. [Finding of Fact Nos. 94–98.] This suggestion lacks any credibility coming from the Cocheners,

particularly Chad, who has no credibility with this Court whatsoever. Regardless, it was their responsibility to make sure that the house was secure and protected from intruders. The condition of the Westlock Property caused it to be sold for approximately $25,000.00 less than it would have had the damage not been done. [Finding of Fact No. 124.] For causing the damage to this property, the Debtor and Chad Cochener are sanctioned this $25,000.00 loss to the estate. The Campbellford Property has not been sold because it has liens of $110,000.00 and is now worth less than that amount in the condition that the Cocheners left it. [Finding of Fact No. 125.] If the Campbellford Property had not been damaged it would have been worth approximately $135,000.00. [Finding of Fact No. 125.] The Debtor and Chad Cochener are also liable for this $25,000.00 loss in value of the Campbellford Property. Thus, the total sanctions against the Debtor and Chad Cochener for the damage to the Real Properties is $50,000.00, for which they will be jointly and severally liable.

Under the Show Cause Order, neither the Debtor nor Chad Cochener were able to show cause why they should not be sanctioned by this Court. An order will be entered on the docket simultaneously with this Memorandum Opinion issuing the sanctions discussed above. The sanctions against Barry are due and payable immediately after entry of the order. The sanctions against the Debtor and Chad Cochener must be paid within 30 days of the date that the order is docketed or, alternatively, the Trustee may accept an installment plan within the same 30 day period upon notice to this Court.

## V. CONCLUSION

Lawyers occupy a special position in this country's judicial system. Not only are

I wish she wasn't part of my life anymore." [Docket No. 132, p. 30:22–25.]

they representatives of and advocates for their clients, but they are also officers of the court who bear responsibility for ensuring the integrity and fairness of our judicial system. *See Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 460, 98 S.Ct. 1912, 1920, 56 L.Ed.2d 444, 456 (1978) (noting that lawyers are "assistants to the court in search of a just solution to disputes."(citation omitted)). Particularly in the consumer bankruptcy system, where the clients are typically very unsophisticated about their legal duties and in desperate straits personally, attorneys must take emphatic care to encourage their clients to comply with the requirements of the Bankruptcy Code and the Bankruptcy Rules.

In the case at bar, Barry not only failed to take such care; he went out of his way to encourage the Debtor to disregard the duties imposed upon her. The Debtor was an unsophisticated, unemployed middle-aged woman who had just been through a nasty divorce and was living with a son who detests her. Initially, at least to some extent, she was on the right track in fulfilling her duties: she went with Hawks to the initial Meeting of Creditors on June 6, 2001, responded to the Trustee's questions, and agreed, through Hawks, to produce the documents requested by the Trustee. However, when Barry took over the representation from Hawks, the Debtor ceased fulfilling any of her duties. Her failure to do so, at least until the time when Barry filed his Motion to Withdraw, was directly due to Barry's counseling. He told her not to attend the continued Meeting of Creditors set for June 20, 2001—and she did not. He told her not to produce the documents that Hawks and she had promised to produce—and she did not. He told her not to attend the rescheduled Meeting of Creditors set for August 29, 2001—and she did not. Barry's justification on the witness stand was: "Well, I represented Ms. Cochener. So, I'm not worried about

what's in the best interest of her creditors. I'm worried about what's in her best interest." [Docket No. 131, p. 13:18–20.] This argument does not come within hailing distance of excusing his conduct. For sure, Barry does not represent the creditors; however, he does have a duty to ensure the integrity and fairness of the bankruptcy system by encouraging the Debtor to provide the Trustee, both through testimony at the Meeting of Creditors and through document production, with information about her financial affairs.

At the Sanctions Hearing, Barry testified that "I believe my representation of Ms. Cochener was in accordance with acceptable practice." [Finding of Fact No. 104.] This Court strongly disagrees. Barry's gaming of the judicial process by filing a frivolous Motion to Dismiss, his instructions to the Debtor not to attend the continued Meeting of Creditors and not to produce documents which Hawks had already agreed she would produce, and his misinforming the Trustee's counsel about the one-year look back period—all of which was done to impede the Trustee's investigation of the Debtor's financial affairs—was completely inimical to acceptable practice, in Houston or anywhere else.

In sum, Barry's conduct in this Court has done much to justify passage of BAPCPA. Congress might well be pleased to know that its perception of abuse is not unfounded. Congress would probably not be pleased to learn about Barry's conduct. For his actions, he will need to immediately write a cashier's check to the Trustee in the amount of $25,121.89.

For their misconduct, the Debtor and her son, Chad Cochener, are sanctioned, jointly and severally, in the amount of $50,000.00 for damage which they inflicted

on the Real Properties; and the Debtor is sanctioned an additional $1,000.00 for her abuse of the bankruptcy process and her refusal to cooperate with the Trustee. The Debtor and her son will have 30 days to pay the Trustee, and they must also remit payment by cashier's check; provided, however, the Trustee, upon notice to this Court, has the right to accept an installment plan within this 30-day period.

Finally, the Trustee has requested that this Court also award prospective attorney's fees in the event that an appeal is taken of this Court's order granting the Motion for Sanctions. The Court declines to grant such relief. If an appeal is taken, then the Trustee may file a separate motion seeking recovery of reasonable attorney's fees and costs.

A separate order consistent with this Memorandum Opinion will be entered on the docket.